**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

v.

**In the Interest of A.W., Defendant–**
**Appellee,**

**and**

**Concerning C.W., Respondent.**

**No. 99SA35.**

Supreme Court of Colorado,
En Banc.

June 14, 1999.

David J. Thomas, District Attorney, First Judicial District, Donna Skinner Reed, Chief Appellate Deputy District Attorney, Golden, Colorado, Attorneys for Plaintiff–Appellant.

Patrick J. Mulligan, Denver, Colorado, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal brought pursuant to C.A.R. 4.1(a) and section 16–15–102(11), 6 C.R.S. (1998), the People urge us to overturn a trial court order suppressing videotaped statements made by the defendant during the initial portion of a stationhouse interview from use in their case-in-chief. Although the People concede that the latter portions of this interview should be suppressed, they further challenge the validity of the trial court's suppression of the defendant's statements therein for impeachment purposes. Upon review of the trial court's findings and the evidentiary record, we reverse the suppression order as to the defendant's initial statements, and affirm the order as to the impeachment use of the latter statements.

I.

On July 3, 1998, Detective Tenny (the detective) of the Lakewood Police Department called A.W., a juvenile who was fifteen years of age at the time, and his father to request that they come to the police station to discuss sexual assault allegations against the juvenile. They agreed. On his way out to meet the juvenile and his father in the stationhouse lobby, the detective stopped off in a room adjoining the interview room in order to start a videotape recorder. Thereafter, the detective led the juvenile and his father into the interview room. Immediately upon entering the room, the juvenile's father noticed a large two-way mirror. To quell the suspicions of the juvenile's father, the detective told him not to worry because "nothing [was] behind there [the two-way mirror]." The detective further noted that, due to the July 4 holiday weekend, there were "not enough people for anyone to be behind there today." The detective also informed the juvenile that he was not under arrest. The juvenile's father testified that he took the detective's assurances to mean that "there was nothing back [behind the mirror] at the time [of the interview]."

In the initial stage of the interview, the juvenile admitted to having had consensual oral sex with the alleged victim. However,

after the Detective asked the juvenile if he could think of any reasons why the alleged victim would make a sexual assault allegation against him, the juvenile answered "No," and continued, saying "She wasn't, like, resisting and telling me, like 'Get away. Get off me.' Nothing like that. I don't know why." The officer then noted that the juvenile had stated that the alleged victim was saying, "Get off me." When the Detective asked the juvenile why the alleged victim would have made the statement "Get off me" if she, in fact, was performing oral sex on him, the juvenile responded that she would not have a reason to say something like that but, "She wasn't pushing me away."

Soon thereafter, the detective excused himself from the room, saying that he would return within a few minutes. Notably, the detective left the room on a total of three separate occasions. The detective never told the juvenile or his father that a video recorder would be taping their conversations in his absence. In fact, the detective went so far as to expound upon his initial assurances to the juvenile's father that "nothing's behind [the mirror]." For example, soon after the detective returned from his first absence, the juvenile's father repeatedly asked the detective if he could speak with his son in private. When the detective eventually agreed to this request, he explicitly stated that he would be right outside and that he would not be listening to the conversation between the juvenile and his father.

The juvenile's father testified at the motions hearing that, in light of the detective's assurances, he "without a doubt" believed that his communications with his son were "private and confidential" and that no one was listening during the detective's absences from the room.[1] However, despite the detective's numerous assurances to the contrary, *all* of the juvenile's statements were in fact videotaped. The videotape intercepted not only the juvenile's statements to the detective, but also the communications between the juvenile and his father in the detective's absence.

Although the juvenile made certain potentially inculpatory statements during the course of his "private" conversations with his father, the juvenile made the bulk of his potentially incriminating statements when the detective returned from his second absence from the interview room. The detective subsequently integrated the juvenile's communications with his father into the police report that he filed with the district attorney. Based, in part, on the juvenile's incriminating statements that were noted therein, the juvenile was charged with one count of first degree sexual assault and one count of second degree sexual assault.

The juvenile moved to suppress all of the statements he made on July 3—not only his communications with his father, but also his communications with the detective. Notably, the juvenile argued that suppression was appropriate, not on Fourth Amendment grounds, but on the grounds that his statements were illegally recorded pursuant to the Wiretapping and Eavesdropping Act, sections 16–15–101 through 16–15–104, 6 C.R.S. (1998), and the Criminal Eavesdropping Statute, sections 18–9–303 and –304, 6 C.R.S. (1998). The trial court granted the juvenile's motion, suppressing the juvenile's July 3 statements in their entirety. This appeal followed.

## II.

The People's principal contentions on appeal relate to the admissibility of the communications videotaped by the detective. It is undisputed that the detective recorded the interview and the conversations between the juvenile and his father without the knowledge or consent of either of the latter parties. Furthermore, the detective recorded

1. The juvenile's father further testified that he took the detective's statements to mean that he would have "complete privacy to discuss [the allegations] with my son [during the detective's absences from the room]." Significantly, when the prosecution brought it to his attention that the detective did not actually say that *nobody* would be listening, the juvenile's father respond-ed by noting that he had "assumed that [the detective's statement] was a general statement ... [meaning that] no one was listening." We note that the prosecution's query failed to consider the broad nature of the detective's actual initial statement to the father – that *"nothing's* behind there."

the juvenile's interview and his conversations with his father without having first obtained a court order authorizing the surreptitious recording or interception of such communications.[2]

Eavesdropping by law enforcement officers in Colorado is governed and comprehensively regulated by the Wiretapping and Eavesdropping Act, sections 16–15–101 through 16–15–104 (hereinafter "the Act"). *See also People v. Rivera,* 792 P.2d 786, 788 (Colo.1990). This statutory scheme requires law enforcement officers to obtain ex parte orders of authorization before intercepting certain wire and oral communications. *See* §§ 16–15–101(1) to –101(7). The Act also limits the particular offenses for which such orders may be issued. *See* § 16–15–102(1)(a).[3]

Absent emergency circumstances delineated in section 16–15–102(19), the People may not introduce the contents of protected "oral communications" into evidence at trial unless their interception of same was authorized by a court order. To this end, section 16–15–102(9), 6 C.R.S. (1998), provides:

> The *contents of any intercepted* wire, *oral,* or electronic *communication or the evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial,* hearing, or other proceeding in a state court, unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

(Emphasis added.)

Section 16–15–102(10), 6 C.R.S. (1998), in turn, provides the means for invoking the foregoing sanction:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the state of Colorado, or a political subdivision thereof, *may move to suppress the contents of any intercepted* written, *oral,* or electronic *communication or the evidence derived therefrom on the grounds that: The communication was unlawfully intercepted;* the order of authorization or approval under which it was intercepted is insufficient on its face; or the interception was not made in conformity with the order of authorization or approval.... *If the motion is granted, the contents of the intercepted* wire, *oral,* or electronic *communication or the evidence derived therefrom shall not be received as evidence.* The remedies and sanctions provided for in this section with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this section involving such communications.

(Emphasis added.)

### III.

█ In arriving at its conclusion that the Act required suppression of the entirety of the juvenile's videotaped statements, the trial court heavily relied upon the Act's expansive

---

2. As an introductory matter, the juvenile argues that the People are not entitled to interlocutory review because: (1) the juvenile made no inculpatory statements during the initial portions of the interview; and (2) therefore, the initial portion of the juvenile's interview cannot be seen as a "substantial part of the proof of the charge pending against the defendant" as required for an interlocutory appeal of a criminal case under C.A.R. 4.1. However, we find this objection to be without merit because the juvenile's statement to the effect that it was not like the alleged victim was telling him to get off her was inculpatory and can be seen as a "substantial part" of the People's case against the juvenile.

3. Section 16–15–102(1)(a), 6 C.R.S. (1998), provides that orders authorizing the interception of wire, oral, or electronic communications may only issue upon a showing that evidence will be obtained of the commission of one of the following crimes: murder in the first or second degree, kidnapping in the first or second degree, gambling, robbery, aggravated robbery, burglary in the first or second degree, bribery, compensation for past official behavior, attempt to influence a public servant, designation of supplier, misuse of official information, dealing in controlled substances, extortion, theft by means other than the use of force, threat, or intimidation, arson, assault in the first or second degree, escape, introducing contraband in the first or second degree, criminal conspiracy to commit any of the foregoing crimes, or limited gaming. *See id.*

definition of what constitutes the "contents" of a communication. The Act defines the term "contents" in the following manner:

"Contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication.

§ 16–15–101(3). After analyzing this definition in conjunction with sections 16–15–102(9) and 16–15–102(10), the trial court found no basis upon which to distinguish the juvenile's initial statements to the detective from his statements that followed the detective's first departure from the room. As such, the trial court held that the entirety of the juvenile's recorded communication, including his initial communications, required suppression because they were illegally intercepted "contents."[4]

■ Contrary to the trial court's holding, our review of the suppression provision of the Act, section 16–15–102(10), reveals a statutory justification for separating the juvenile's initial statements from those that he made after the detective's first departure from the room. The Act defines an "oral communication" in the following manner:

"Oral communication" means any oral communication uttered by any person believing that such communication is not subject to interception, *under circumstances justifying that belief,* but does not include any electronic communication.

§ 16–15–101(8) (emphasis added).[5] It is well-established that oral communications uttered "under circumstances justifying [the] belief" that they are "not subject to interception" are those in which the speaker had a reasonable expectation of privacy. *See, e.g., People v. Hart,* 787 P.2d 186, 188 (Colo.App.

1989); James G. Carr, *The Law of Electronic Surveillance* § 3.2(b), at 3–9 (2d ed.1989).

Significantly, the trial court overemphasized the importance of the inclusive definition of "contents," at the expense of the equally important, and *limited,* definition of "oral communication[s]." The Act does not extend to all communications uttered orally, but only provides for the suppression of the "contents" of protected "oral communications" as they are defined in section 16–15–101(8). *See also* §§ 16–15–101(3), 16–15–102(9), 16–15–102(10). In essence, the trial court failed to recognize the circumscribed nature of the "oral communications" that fall under the purview of the Act.

Given the Act's limited definition of "oral communication," we must apply the two part test established in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), to determine whether the juvenile had a reasonable expectation that his initial conversation with the detective was private. *See In re John Doe Trader Number One,* 894 F.2d 240, 242 (7th Cir.1990) (citing S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin. News 2112, 2178, for proposition that federal wiretapping act, after which Colorado's Act was patterned, intended to parallel *Katz* test); *United States v. McIntyre,* 582 F.2d 1221, 1223 (9th Cir.1978). This test requires the juvenile's expectation of privacy to have been both subjectively and objectively reasonable. *See California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). As such, our first inquiry is whether the juvenile exhibited an expectation that his spoken words were not subject to intercep-

---

**4.** In support of its finding that the juvenile's statements could not be bifurcated, the trial court also relied on CRE 106, the rule of completeness. Citing this rule, the trial court held that the juvenile's initial statements could not be fairly isolated from his later statements because it was foreseeable that the juvenile would be forced to refer to his latter statements in order to explain his initial ones. In essence, the trial court interpreted the rule of completeness as one favoring *suppression* of an entire "document," so long as one portion of the document had to be suppressed.

However, the trial court's reliance on the rule of completeness was misplaced. The trial court misinterpreted the statute as one favoring suppression when, in reality, the rule favors the *admission* of a criminal defendant's entire statement. *See, e.g., McRae v. People,* 131 Colo. 305, 311–12, 281 P.2d 153, 156 (1955).

**5.** The Act defines the term "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." § 16–15–101(5).

tion. If the juvenile exhibited such an expectation, our second inquiry is whether the circumstances justified his expectation of privacy. *See* § 16–15–101(8).

■ Significantly, the trial court conducted no privacy analysis of the juvenile's initial statements to the detective.[6] In light of our review of the record, we find that the juvenile's initial statements fail to satisfy the *Katz* test. Simply put, one who is speaking in the actual presence of a police officer or detective has neither a subjectively nor an objectively reasonable expectation of privacy. *See, e.g., United States v. Burns,* 624 F.2d 95, 100 (10th Cir.1980) (holding that defendant had no reasonable expectation of privacy in a conversation that could be heard by police officer situated in hallway outside motel room door, without the aid of any listening device); *United States v. Agapito,* 620 F.2d 324, 329–32 (2d Cir.1980); *People v. Smith,* 716 P.2d 1115, 1118 (Colo.1986) (holding that defendant who was accompanied to telephone by jailhouse personnel does not have a reasonable expectation of privacy in his telephone communications); *People v. Hart,* 787 P.2d 186, 187–88 (Colo.App.1989) (holding that defendant had no reasonable expectation of privacy where police officers, who were lawfully situated in the neighboring motel room, could hear his conversation without the aid of any listening device); Carr, *The Law of Electronic Surveillance* § 3.2[b], at 3–11.

As the juvenile could not have had a reasonable expectation of privacy in his initial statements to the detective, we find that these statements were not protected "oral communications" for purposes of the Act.

Given the absence of a valid justification for applying section 16–15–102(10), we reverse the trial court's suppression of the juvenile's initial statements to the detective.

## IV.

In both their written motions and at the motions hearing itself, the People repeatedly conceded that suppression was the appropriate action insofar as the juvenile's statements that followed the detective's first departure from the room were concerned. In fact, the People's Response to the Juvenile's Motion to Suppress Statement provided:

> Due to there being an arguable claim of a Fourth Amendment violation, the prosecution is confessing the Motion to Suppress Statement in regard to *all* the statements made by the Juvenile after the first time Detective Tenny excuses himself from the interview room.

(Emphasis added.) Similarly, the People's plea for relief in this responsive motion requested "that this Court deny the Juvenile's Motion to Suppress Statement *in regard to the first portion of the statement, prior to Detective Tenny's departure from the interview.*" (Emphasis added.) Moreover, the prosecution reiterated the limited nature of the People's objection on numerous occasions during the motions hearing.[7]

■ Despite the People's position at the hearings, they argue herein that the statements that the juvenile made in the detective's presence after the detective returned following each of his three absences were

---

6. The trial court began its review of the juvenile's statements by considering the admissibility of the statements that the juvenile made following the detective's initial departure from the room. After determining that the juvenile's latter statements had to be suppressed, the trial court found that it had no choice other than to suppress the entirety of the juvenile's statements.

7. The following comments made by the prosecution illustrate that the People conceded that the juvenile's later statements should be suppressed. One prosecutor noted early on in the motions hearing that

> we have indeed in our response to the juvenile's motion to suppress, have confessed suppression of any of the juvenile's statement after the time that Detective Tenny leaves the room.

> So we confess that, Judge. And the reason we confessed that was basically because of this arguable issue that there is a fourth amendment violation. We think suppression is really the only remedy here....

Transcript of Dec. 17, 1998 Motions Hearing, at 14. In closing, another prosecutor noted:

> So we submit that the only appropriate remedy, and which we did concede, was a suppression of the statements. And actually, there's some disagreement about maybe we conceded too much, but ... we're willing to abide by our argument not to use *any* of the statements after the officer left the room.

Transcript of Jan. 13, 1999 Motions Hearing, at 100.

erroneously suppressed because, but for the videotaping, they would have been legally obtained statements. However, given the People's failure to raise this argument before the trial court, we need not address it now. Accordingly, we affirm the trial court's suppression of these statements from the People's case-in-chief.

## V.

■ The second issue before us is whether the juvenile's statements may be used for impeachment purposes. Invoking the plain language of the Act, the trial court held that *none* of the juvenile's statements were admissible for such purposes because the impeachment use of illegally intercepted communications would violate section 16–15–102(9)'s express prohibition against the receipt into evidence or the disclosure of the contents of protected oral communications at trial. However, in light of our determination that the juvenile's initial statements to the detective are admissible in the People's case-in-chief, it naturally follows that these initial statements are also admissible for impeachment purposes. *See, e.g.,* Carr, *The Law of Electronic Surveillance* § 7.6, at 7–105. As such, the specific issue before this court is whether the statements the juvenile made after the detective's first departure from the room are admissible for impeachment purposes.

As noted above, we must first evaluate these statements under the two-prong reasonable expectation of privacy test set forth in *Katz.* It is uncontested that the juvenile and his father had a reasonable expectation of privacy in the statements made when the detective was absent from the room. However, the People do contend on appeal that the trial court erred in finding that the juvenile had a reasonable expectation of privacy in the statements that he made to the detective when he returned from each of his three absences from the room.

Before addressing the merits of the People's impeachment arguments, we again must determine whether the statements that the juvenile made after the detective's first departure from the room constitute "oral communications" protected under the Act. The trial court found that the juvenile and his father had a reasonable expectation of privacy which was created or bolstered by the detective's repeated representations that neither he nor anyone else would be listening to their conversations.

Notably, the trial court did not draw any distinction between the statements that the juvenile made to his father, and those statements that the juvenile made to the detective following his absences from the room. Instead, the trial court held that the juvenile had a reasonable expectation of privacy in all of the statements that he made after the detective's first departure from the room.

However, we find that the trial court erred in failing to distinguish between these statements. As noted in our foregoing analysis of the juvenile's initial statements to the detective, under *Katz,* there is no expectation of privacy when one speaks in the presence of a police officer. *See* Carr, *The Law of Electronic Surveillance* § 3.2(b), at 3–11. Therefore, we find that the juvenile did not have a reasonable expectation of privacy in the statements he made to the detective following the latter party's absences from the room.[8]

Turning next to the question of whether the juvenile had a reasonable expectation of privacy in the statements made to his father during the detective's absences, we find that these communications satisfied both prongs of the *Katz* test. Specifically, we find that the detective's initial assurances that nothing or nobody was behind the two-way mirror and his later assurances that he would not be listening in, gave rise to a subjectively and an objectively reasonable expectation of privacy in his communications with his father. *See, e.g., McIntyre,* 582 F.2d at 1224; *People v. Hammons,* 235 Cal.App.3d 1710, 5 Cal.

---

**8.** Absent a reasonable expectation of privacy in his latter communications to the detective, these statements cannot be considered protected "oral communications" under the Act. However, this is not to say that these statements could not be subject to suppression under section 16–15–102(10). We will examine the outstanding issue of whether these statements were impermissibly "derived from" the juvenile's statements to his father in section VI, *infra.*

Rptr.2d 317, 319–20 (1991). Since the juvenile had a reasonable expectation of privacy in his communications with his father, these statements constituted protected "oral communications" pursuant to section 16–15–101(8).

■ Given our finding that the juvenile's communications with his father do indeed fall under the rubric of the Act's protections, we must take our analysis one step further to determine whether the Act permits the impeachment use of illegally intercepted communications. As this issue is one of first impression in Colorado, the People urge us to look to federal law for guidance. According to the People, reference to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended 18 U.S.C. §§ 2510 to 2521 (1970 & 1993 Supp.) (Title III), the federal wiretapping act upon which Colorado's Act was patterned, demonstrates that the trial court erred in holding that statements made by the juvenile following the detective's first departure from the room were inadmissible for impeachment purposes.[9]

Specifically, the People emphasize the importance of our prior holding in *People v. Wahl*, 716 P.2d 123, 128 (Colo.1986), wherein we discussed the relationship between the federal wiretapping act and the state act, to wit:

> Colorado's statute governing electronic surveillance is closely patterned after and designed to implement the policies of the federal act. Federal authorities explaining the federal act should thus be accorded great weight in interpreting the Colorado statute. The definitions of "intercept" and "contents" contained in the Colorado statute are identical to those in the federal act. *Compare* 18 U.S.C. § 2510(4), (8) *with* § 16–15–101(3), (5), 8 C.R.S. (1978).

*Id.* In essence, the People argue that this professed deference to federal authorities requires us to follow the lead of several circuit courts that have interpreted Title III's sup-

pression provision as permitting the use of illegally intercepted communications for impeachment purposes.

We disagree with the People's argument for two reasons. First, the People fail to acknowledge that the plain language of the Colorado Act admits no exception for impeachment uses of illegally intercepted communications. Second, the federal circuit cases cited by the People are readily distinguishable from the instant case.

### A.

We begin, as the review of any question of statutory interpretation must, with the plain language of the Colorado Act itself. *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917), for proposition that "[W]here ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' "). As noted above, the Act provides that, if an "oral communication" is intercepted without an order authorizing such interception, a party to that communication may move to have its contents suppressed in any judicial proceeding. *See* § 16–15–102(10). Notably, the detective herein *could not* have secured an eavesdropping authorization order because sexual assault is not among the crimes for which such orders are available under the express terms of the Act. *See* § 16–15–102(1)(a). Most importantly, however, the Act admits no exception for the impeachment use of illegally intercepted communications. *See* § 16–15–102(9) (providing that the "contents of any intercepted ... oral ... communication or the evidence derived therefrom *shall not be received in evidence or otherwise disclosed in any trial*") (emphasis added). Furthermore, although the Act enumerates several circumscribed exceptions in which law enforcement officers may deviate from the strict mandate of the Act,[10] none of these exceptions applies to the instant case.

---

9. The federal wiretapping statute, in effect, establishes minimum standards for the admissibility of evidence procured through electronic surveillance. State law cannot be less protective of privacy than the federal act. *See, e.g., United*

*States v. McKinnon*, 721 F.2d 19, 21 n. 1 (1st Cir.1983); *People v. Otto*, 2 Cal.4th 1088, 9 Cal. Rptr.2d 596, 831 P.2d 1178, 1184 (1992).

10. The Act admits the following exceptions: § 16–15–102(16) (allowing law enforcement offi-

Reference to the four specific statutory exceptions of section 16–15–102 further supports our conclusion that the plain command of sections 16–15–102(9) and 16–15–102(10) does not permit us to read an implied exception into the statute. As a general rule of statutory construction, "[t]he enumeration of exclusions from the operation of a statute indicates that the statute should apply to all cases not specifically excluded." 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.23, at 217 (5th ed.1992). Applying this rule here, we find that the existence of the specifically enumerated exceptions in section 16–15–102 indicates that section 16–15–102(10) should apply to all circumstances not specifically excepted.[11] Had the legislature intended to afford the courts with the general authority to create exceptions to section 16–15–102(10), they would have specified that this was the case. *See United States v. Vest,* 813 F.2d 477, 482 (1st Cir.1987); *Nicholas v. People,* 973 P.2d 1213, 1216 (Colo.1999). Therefore, we conclude that we should not read a further exception into the statute for the impeachment use of illegally intercepted communications.

cer who is engaged in the authorized interception of oral communications, but who intercepts oral communications relating to an offense other than one specified in the order of authorization, to disclose contents and evidence derived therefrom); § 16–15–102(17) (permitting law enforcement officers to deviate from authorization order specifications regarding the place where the communications are to be intercepted under certain circumstances); and, § 16–15–102(18) (allowing law enforcement officers to intercept communications for 24 hours or less, in emergency situations involving hostages or a kidnapping if there is imminent danger of serious bodily injury or death and there are reasonable grounds upon which an authorization order could be secured).

Our holding in *People v. Morton,* 189 Colo. 198, 201, 539 P.2d 1255, 1258 (1975), recognized the existence of an additional exception to section 16–15–102(10) in cases where one party to the conversation has agreed to the recording. As such circumstances constitute consensual recorded eavesdropping under sections 18–9–303 and 18–9–304, there is no "unlawful interception" within the meaning of section 16–15–102(10). *Id.*

**11.** Supreme Court pronouncements regarding the expansive scope of the analogous federal wiretapping act, Title III, are also illustrative. In sum, the People's request that we carve a new exception to the Act cannot be squared with the

## B.

The plain language of the Act notwithstanding, the People essentially ask this court to create a new, unenumerated exception to the Act's comprehensive ban on nonconsensual electronic surveillance, which would allow the impeachment use of illegally intercepted communications. In support of their argument, the People rely heavily upon the fact that several federal circuit courts have recognized the existence of such an exception to Title III's suppression provision set forth at 18 U.S.C. § 2515, reasoning that such an exception is rooted in the legislative history of Title III. *See Culbertson v. Culbertson,* 143 F.3d 825, 828 (4th Cir.1998); *U.S. v. Echavarria–Olarte,* 904 F.2d 1391, 1397 (9th Cir.1990); *United States v. Caron,* 474 F.2d 506, 509–10 (5th Cir.1973).

As Colorado's Act was patterned after Title III and the state and federal suppression provisions are virtually identical,[12] we may look to Title III and cases interpreting its suppression provision for guidance.[13] However, a review of the cases cited by the

high court's flagship holding that, "Except as expressly authorized in Title III, . . . all interceptions of wire and oral communications are flatly prohibited." *Gelbard v. United States,* 408 U.S. 41, 46, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). As the high Court further explained, "The purpose of [Title III] . . . was effectively to prohibit . . . all interceptions of oral and wire communications, except those specifically provided for in the act...." *United States v. Giordano,* 416 U.S. 505, 514, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

**12.** 18 U.S.C. § 2515 provides:

Prohibition of Use as Evidence of Intercepted Wire or Oral Communications. Whenever any wire or oral communication has been intercepted, *no part of the contents* of such communication and *no evidence derived* therefrom may be received in evidence in any trial, hearing, or other proceeding *in or before any court,* grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

(Emphasis added.)

**13.** Given basic tenets of federal preclusion, Title III establishes minimum standards for the admissibility of evidence procured through electronic surveillance. As such, the state Act cannot be

People reveals that they are readily distinguishable from the instant case because none of them addressed non-consensual, unauthorized wiretapping by law enforcement officers. *See Culbertson,* 143 F.3d at 828 (holding that transcripts of wife's telephone conversations, which were recorded by husband, were admissible in divorce proceedings to impeach wife's contradictory affidavit); *Echavarria–Olarte,* 904 F.2d at 1397 (admitting evidence obtained through court authorized wiretap of telephones of two conspirators for use against third conspirator and noting, in dicta, that even if the wiretaps had been illegal, the recorded statements "were, to the extent that they contradicted statements made on direct examination, admissible for impeachment purposes"); *Caron,* 474 F.2d at 508–10 (reviewing impeachment use of evidence intercepted via a legal wiretap, but noting in dicta that even if the wiretap had been illegal, the admission of taped communications would have been appropriate).[14]

In conclusion, therefore, a reading of the plain language of the Act leads to the inescapable conclusion that oral communications intercepted absent the color of an authorization order may not be received into evidence for any purpose, including impeachment purposes, under the strict exclusionary mandate of the Act.

## VI.

Finally, we turn to the question of whether the statements that the juvenile made to the detective after his various absences from the room may be used for impeachment purposes. As the trial court did not determine whether the detective had "derived" these statements from the juvenile's statements to

his father after reviewing the videotape, we remand this issue for further factual findings.

As noted above, absent a reasonable expectation of privacy, these statements cannot be considered to be protected "oral communications" under the Act. However, this is not to say that these statements could not still be subject to suppression under section 16–15–102(10). This section provides that "[i]f the motion [to suppress] is granted, the contents of the intercepted ... oral ... communication or *the evidence derived therefrom shall not be received as evidence.*" § 16–15–102(10). As such, we must determine whether the juvenile's latter statements to the detective were "derived" from the juvenile's suppressed statements to this father.

In reviewing this question, the trial court once again afforded great weight to the expansive statutory definition of "contents" at section 16–15–101(8), just as it had in reviewing the juvenile's initial statements to the detective. After noting that the juvenile's statements to the detective had changed and evolved over the course of his interview, the trial court relied on this definition in suppressing the entirety of the juvenile's statements. In support of this holding, the trial court reasoned that, were it to admit the juvenile's statements to the detective while suppressing the juvenile's statements to his father, it could put the juvenile in the difficult situation of having to attempt to explain a portion of the statement by referring to some portion of the suppressed statement.

■ Significantly, the trial court misinterpreted the nature of section 16–15–102(10)'s "derived from" mandate. The trial court found that the juvenile's latter statements to the detective were "derived from" his sup-

---

less protective of privacy than the federal Act. *See, e.g., People v. Otto,* 9 Cal.Rptr.2d 596, 831 P.2d at 1184. However, in prior opinions, we have recognized that the state Act affords greater privacy protections than Title III. *See, e.g.,* Richard I. Zuber, *Domestic Eavesdropping and Wiretapping: Admissibility of Intercepted Communications,* 21 Colo. Law 455, 457 (1992); Jonathan Turley, Note, *United States v. McNulty: Title III and the Admissibility in Federal Court of Illegally Gathered State Evidence,* 80 Nw. U.L.Rev. 1714, 1716 n.10 (1986).

**14.** Leading legal commentators have also repudiated the line of reasoning advocated by the People. According to Professor James G. Carr, Reporter for the American Bar Association Task Force on Electronic Surveillance, the impeachment use of illegally intercepted communications is also at odds with the direct language of section 2515 of the federal act. *See* James G. Carr, *The Law of Electronic Surveillance* § 7.6(a), at 7–106 (2d ed.1989). In his preeminent treatise on electronic surveillance, Professor Carr aptly notes that "[w]hen recordings are used to impeach a witness, they are evidence, and introduced and regarded as such." *Id.*

pressed communications to his father because they naturally *followed from* or *evolved from* the suppressed statements. However, this is not the proper inquiry under the statute. Section 16–15–102(10) does not require the suppression of an aggrieved person's statements simply because they were derived from or flowed naturally from the illegally intercepted communications. Instead, section 16–15–102(10) requires the party who illegally intercepted the communication to have been the one to "derive" other evidence therefrom (i.e., that the detective reviewed or had knowledge of the content of the videotaped communications before resuming his questioning of the juvenile).

The trial court did not make any factual findings as to whether the detective had knowledge of the videotaped communications between the juvenile and his father before returning to the room to resume questioning the juvenile. In fact, the trial court's order granting the juvenile's motion to suppress stated:

> I find that the whole of the statement is ... evidence derived from [the illegally intercepted] communications, ... *although Detective Tenny at the time he was talking to the juvenile may have not been aware of it.*

(Emphasis added.) [15]

Appellate courts are not empowered to make factual findings, absent such findings in the record below. *See, e.g., M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1382 (Colo. 1994) (absent certain circumstances, such as when undisputed facts are presented to trial court by stipulation or by uncontested documentary evidence, an appellate court may not decide facts); *Gebhardt v. Gebhardt,* 198

Colo. 28, 30, 595 P.2d 1048, 1050 (1979) (noting that "[i]t is axiomatic that an appellate court cannot substitute itself as a finder of fact").

Therefore, we remand this issue to the trial court for further findings consistent with our analysis of the language of section 16–15–102(10). *See, e.g., People v. D.F. & Z.A.,* 933 P.2d 9, 14 (Colo.1997); *People v. Turtura,* 921 P.2d 40, 44 (Colo.1996); *People v. Sutherland,* 886 P.2d 681, 688 (Colo.1994). On remand, should the trial court find that these statements were not "derived from" the suppressed statements that the juvenile made to his father, these statements will be admissible for impeachment purposes under the Act.

### VII.

Accordingly, we reverse the trial court's suppression of the juvenile's initial statements and hold that these statements are admissible under the Act for substantive as well as for impeachment purposes. Furthermore, we affirm the trial court's suppression of the statements that the juvenile made to his father while the detective was absent from the room. Finally, we remand the issue of whether the detective "derived" the statements that the juvenile made after the detective's absences from the room from the illegally intercepted communications between the juvenile and his father.

---

**15.** Furthermore, the trial court made contradictory findings regarding the juvenile's Motion to Dismiss Due to Outrageous Governmental Misconduct, to wit:

> [t]he Court finds the evidence shows that during the course of the interviews by Detective Tenny, that he did not use the information that

was obtained for further discussion and questioning of the juvenile after there were breaks during it, but did then, subsequent to the juvenile leaving, review the tape, find that information, incorporate it into his report.

This motion is not before us on appeal.