COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Frank and Senior Judge Hodges
Argued at Chesapeake, Virginia


AKEIM ELIJAH BELMER
                                            OPINION BY
v.    Record No. 2344-00-1           JUDGE ROBERT P. FRANK
                                         OCTOBER 2, 2001
COMMONWEALTH OF VIRGINIA


         FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                    A. Bonwill Shockley, Judge

             Michael F. Fasanaro, Jr. (Abrons, Fasanaro &
             Sceviour, P.L.L.C., on brief), for appellant.

             (Mark L. Earley, Attorney General; Leah A.
             Darron, Assistant Attorney General, on
             brief), for appellee.


     Akeim Elijah Belmer (appellant) was convicted by a jury of

robbery, in violation of Code § 18.2-58, use of a firearm during

the commission of a felony, in violation of Code § 18.2-53.1,

and conspiracy to commit robbery, in violation of Code

§ 18.2-22.  On appeal, appellant contends the trial court erred

in denying his motion to suppress a statement he made to his

mother in the police interrogation room.  For the reasons that

follow, we affirm the convictions.

                         I.   BACKGROUND

     In November 1999, Jason Bonelli and appellant were students

at Tallwood High School in the City of Virginia Beach.  Bonelli

told appellant he wanted to purchase stereo equipment for his car.

On November 16, 1999, appellant told Bonelli that appellant's brother, Shaheed Williams, had a compact disc player for sale. Appellant arranged with Bonelli to meet at Brandon Middle School at 6:00 p.m. that evening, where Williams would sell Bonelli the stereo. Appellant told Bonelli to bring "around $200.00."

Bonelli drove to the school, where he met appellant and Demetrius Norman, appellant's friend. A "masked man" approached Bonelli, and when appellant attempted to intervene, the assailant ran after appellant, chasing him behind some dumpsters. Norman drove away, and as Bonelli attempted to do the same, the assailant entered Bonelli's vehicle, shoved a gun in Bonelli's ribs, and said, "I'm going to spray you." The assailant then took $214 from Bonelli's pants pocket and fled.

Appellant came from behind the dumpsters after the assailant left and asked Bonelli what had happened. Appellant appeared "not very scared." Bonelli believed he had been set up. He told appellant he knew appellant was involved in the robbery and that he would contact the police. Appellant told Bonelli to "drop it." Bonelli asked appellant "where his brother was." Appellant did not give him an answer. Appellant then said, "Oh, well, he's at home."

Norman testified that he picked appellant up at appellant's house and drove him to Brandon Middle School where appellant planned to rob Bonelli, but Norman admitted telling the police at least two or three different versions of the incident.

Appellant, a juvenile, was arrested and taken to police headquarters. Appellant entered through the rear door of the detective bureau.

Detective J.L. Gandy met appellant's mother and her boyfriend in the lobby where a posted sign stated that the interview rooms were "electronically monitored and may be recorded." The sign is six to twelve inches in size. The interview room is permanently equipped with a glass window through which interviews can be heard and observed.

It is uncontroverted that appellant did not pass the notice sign, although his mother and her boyfriend passed through the lobby to enter the interview room. The wall on which the notice sign was posted also contained a telephone, a large mural, and other posted items. The detective did not point out the sign to appellant's mother or her boyfriend. The interview room contained no signs warning of any monitoring.

In the interview room, the detective read appellant his Miranda rights. The mother's boyfriend, who identified himself as appellant's stepfather, indicated appellant would make no statements until he consulted with an attorney. Detective Gandy "felt it would be best if [appellant] consulted a lawyer before

anything was said."  The detective then left the interview room and went to the "monitoring room," which contained equipment that allowed him to overhear conversations in the interview room.  The detective testified he allowed appellant, his mother and the mother's boyfriend to remain in the interview room because the detective had "some paperwork to complete" and he wanted to see if they would talk to each other.

Detective Gandy then electronically overheard a "whispered" conversation between appellant and his mother's boyfriend.  The detective testified he overheard appellant say that "their other son may be involved also."  Appellant whispered that "he didn't know how the police found out."  He said, "Demetrius must have told them."  Detective Gandy indicated it appeared appellant was trying to "hide" the conversation.

Appellant filed a motion to suppress the statements "overheard" by Detective Gandy.  The trial court denied the motion, finding appellant had no reasonable expectation of privacy in a police station, "especially in an interrogation room."

## II.  ANALYSIS

The Commonwealth contends that the issue on appeal is procedurally defaulted under Rule 5A:18.  When the trial court denied appellant's motion to suppress, defense counsel responded, "Yes, sir."  The Commonwealth maintains that counsel's response did not preserve appellant's claim on appeal.

"The primary function of [Rule 5A:18] 'is to alert the trial judge to possible error so that the judge may consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals and mistrials.'" Johnson v. Commonwealth, 20 Va. App. 547, 553, 458 S.E.2d 599, 601 (1995) (en banc) (citation omitted).

In this case, the hearing on the motion to suppress clearly alerted the trial court to the issue. Evidence was presented and arguments were heard. Requiring appellant to "except" to the court's denial of his motion "would, in effect, recreate the requirement of noting an exception to a final adverse ruling of the trial judge." Martin v. Commonwealth, 13 Va. App. 524, 530, 414 S.E.2d 401, 404 (1992) (en banc). "As we stated in Martinez v. Commonwealth, 10 Va. App. 664, 668, 395 S.E.2d 467, 470 (1990), aff'd as modified, 241 Va. 557, 403 S.E.2d 358 (1991), 'the requirement for an exception [has been] eliminated.'" Id. We, therefore, conclude this issue is not procedurally defaulted under Rule 5A:18.

While neither appellant nor the Commonwealth directly addressed Code §§ 19.2-61 to 19.2-70.3, Interception of Wire, Electronic or Oral Communications, we find it necessary to address this chapter of the Code.[1]

---

[1] Appellant's argument in the trial court was sufficient to preserve for appeal the question of application of this chapter of the Code. Although appellant did not cite a particular code section, he argued, "the law is clear. It's against the law to

> In general, Chapter 6 of Title 19.2
> regulates (1) the interception, by any
> electronic, mechanical, or other device, of
> certain "wire or oral communications" as
> defined in the chapter, and (2) the
> disclosure by any person of the contents of
> any such wire or oral communication which
> has been so intercepted.  Except as
> permitted by the terms of the chapter, it is
> unlawful, constituting a felonious offense,
> for any person willfully to intercept, or
> willfully to disclose the contents of, any
> wire or oral communication.  Va. Code
> § 19.2-62.

Wilks v. Commonwealth, 217 Va. 885, 887, 234 S.E.2d 250, 251 (1977).

Code §§ 19.2-66 and 19.2-68 establish a procedure under which the Attorney General may apply for an order authorizing the interception of a wire or oral communication.  In this case, it is not claimed that such an order was entered.

---

intercept an oral conversation -- and this is clearly an oral conversation [--] by electronic means . . . without the consent of one of the participants in the conversation where the participants are in a situation where there is a reasonable expectation of privacy."  Furthermore, as long as an issue is properly preserved, we are not required to disregard controlling statutes or rules of court merely because the trial court or counsel failed to take cognizance of them.  As long as the issue was properly preserved, an appellate court shall decide the issue according to controlling legal principles.  Rule 5A:18 "does [not] prevent this Court, on its own initiative, from relying on statutory or judicial authority that was not presented to the trial court or referred to in the briefs submitted by the parties."  Lash v. County of Henrico, 14 Va. App. 926, 929, 421 S.E.2d 851, 853 (1992) (en banc) (citing R. Martineau, Modern Appellate Practice § 3.9 (1983)).  Nevertheless, the analysis is the same under the statutory scheme as under the Fourth Amendment.  Wilks v. Commonwealth, 217 Va. 885, 889, 234 S.E.2d 250, 252 (1977).

Code § 19.2-65 creates an "exclusionary rule" for any information obtained in violation of the chapter.

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding in or before any court, grand jury, department, officer, commission, regulatory body, legislative committee or other agency of this Commonwealth or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

Code § 19.2-65.

Code § 19.2-63.1 requires the Chief of Police to have direct control over any such device which is in the possession of the police department. See Code § 19.2-63.1.

We begin our analysis with the definition of "oral communication" under Code § 19.2-61. Code § 19.2-61 states, "'Oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectations but does not include any electronic communication . . . ." "Thus, an oral communication is not protected by Chapter 6 unless (1) the speaker exhibits the expectation that his conversation will not be intercepted, and (2) the circumstances justify the expectation of noninterception." Wilks, 217 Va. at 888, 234 S.E.2d at 252. "[T]he justifiable expectation of noninterception contained in

the statutory definition of the term 'oral communication' is equivalent to the constitutional expectation of privacy." Id. at 889, 234 S.E.2d at 252.

In a Fourth Amendment context, protection is afforded "if, first, a person has exhibited an actual, subjective expectation of privacy in the subject area and, second, if that expectation is one that society is prepared to recognize as 'reasonable.'" Wellford v. Commonwealth, 227 Va. 297, 301, 315 S.E.2d 235, 237 (1984) (citing Katz v. United States, 389 U.S. 347, 361 (1967); United States v. Knotts, 460 U.S. 276 (1983); Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978); Patler v. Slayton, 503 F.2d 472 (4th Cir. 1974); State v. Brady, 406 So.2d 1093 (Fla. 1982), cert. granted sub nom. Florida v. Brady, 456 U.S. 988 (1982)).

The record clearly establishes that appellant manifested a subjective expectation of privacy in the interview room at the time he made the statements. It was uncontroverted that appellant, a juvenile, entered police headquarters through the rear door of the detective bureau and, thus, did not pass a sign posted in the lobby which indicated that conversations in the interview rooms were "electronically monitored and may be recorded." Although appellant's mother and her boyfriend may have had an opportunity to see those signs, the record establishes that they made no statements to appellant about the signs.

Further, the record provides no indication that appellant said anything to Detective Gandy about the offense for which he had been arrested. When Detective Gandy, appellant, appellant's mother, and her boyfriend, Carl Gray, met in the interview room, Gray told Detective Gandy that appellant would not make any statements until they had consulted a lawyer. Appellant said nothing to contradict Gray's statement. When Detective Gandy left the room, appellant whispered to Gray at a level indicating to Detective Gandy that appellant was "trying to hide what [he] was saying" and that appellant's whispers likely would not have been heard outside the interview room if not for the electronic monitoring equipment located inside the room.

Thus, the only conclusion from the evidence is that appellant manifested a subjective expectation of privacy in the closed interview room. The only issue in dispute is whether this expectation of privacy is one that society is prepared to recognize as reasonable. See Wellford, 227 Va. at 301, 315 S.E.2d at 237.

Most courts considering the issue have held that prisoners generally have no expectation of privacy in conversations with visitors because routine monitoring and recording of such conversations is a reasonable means of maintaining prison security. See, e.g., United States v. Hearst, 563 F.2d 1331, 1345-46 (9th Cir. 1977), cert. denied, 435 U.S. 1000 (1978). In dicta in Lanza v. New York, 370 U.S. 139 (1962), the United

States Supreme Court addressed the Fourth Amendment implications of a jail communication that was electronically intercepted. Lanza spoke to his brother, who was an inmate in a New York jail, in a jail visiting room, and the conversation was recorded by the police, unknown to Lanza or his brother. Id. at 139. The recorded conversation was transcribed. Id. at 141. A copy of that transcript was given to a committee of the New York legislature investigating possible corruption in the state parole system. Id.

Lanza was called to testify before the legislative committee, which posed a number of questions to Lanza based on the transcript of the taped jail conversation. Id. at 140. Lanza refused to answer the questions and subsequently was indicted, tried and convicted for failure to testify before the legislative committee. Id.

Lanza argued before the United States Supreme Court that the interception of his conversation violated his Fourth Amendment rights and, therefore, that the committee's use of the transcript was impermissible. Id. at 141-42. Essentially, Lanza argued that the visitors' room in the jail was a constitutionally protected area and that the eavesdropping was an unreasonable search and seizure. Id. at 142.

The Supreme Court noted that "a jail shares none of the attributes of privacy of a home, an automobile, an office or a hotel room." Id. at 143. The Court further stated, "In prison,

official surveillance has traditionally been the order of the day."  Id.  However, the Court continued, "[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection . . . ."  Id. at 143-44.

This language in Lanza suggests that a privileged relationship can affect the determination of whether a reasonable expectation of privacy exists in a particular situation.  However, appellant did not argue to the trial court nor in his brief that any privilege[2] applied here.

Only at oral argument, in response to specific questions from the Court, did counsel mention the parent-child relationship as a factor to consider in the analysis of a reasonable expectation of privacy.  No argument or case law was presented, however, to support the existence of a parent-child privilege.

Therefore, we cannot now consider the issue of privilege on appeal and address only whether appellant had a reasonable expectation of privacy in the police interview room.  "We do not address" issues that the parties failed to raise at trial and failed to present or develop on appeal.  Powell v. Commonwealth, 36 Va. App. 231, 232, 548 S.E.2d 926, 927 (2001).

---

[2] While the dissent's discussion of a parent-child privilege is compelling, we do not feel we can reach that issue.

In *Ahmad A. v. Superior Court*, 263 Cal. Rptr. 747, cert. denied, 498 U.S. 834 (1990), the California Court of Appeal considered the secret recording of a conversation between a boy and his mother in a police interrogation room. That court explained the continuing viability of *Lanza*:

> Although "*Lanza* epitomized the 'protected areas' type of analysis repudiated in [*Katz v. United States* (1967) 389 U.S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576]," federal courts "have consistently followed *Lanza* and upheld admission of monitored conversations in jails or police stations. 'It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in *Lanza v. New York* [citation] and it appears to have survived *Katz v. United States* [citation].' [Citations.]" (*Id.*, at pp. 29-30, 196 Cal. Rptr. 704, 672 P.2d 110.) "[N]o federal case has repudiated the *Lanza* dictum or excluded a jail or police station conversation from evidence. [Citation.] If occasional state court cases such as [*De Lancie v. Superior Court*, supra, 31 Cal.3d 865, 183 Cal. Rptr. 866, 647 P.2d 142] take a different course, they do so on state, not federal grounds. Bound in matters of federal law by the United States Supreme Court, which has never rejected its dictum in *Lanza v. New York*, and influenced by decisions of the lower federal courts, we are impelled to conclude that the *Lanza* dictum continues to control in federal law." (*Id.*, at p. 30, 196 Cal. Rptr. 704, 672 P.2d 110.)
> Beyond the sparse and uncontested facts attested to by the investigating officer, the record contains no evidence of a subjective expectation of privacy as to the minor's conversation with his mother. Moreover, any such belief would not have been objectively reasonable in a police station given the conclusions reached in

> Donaldson v. Superior Court, supra. (Ibid.)
> Indeed, in the jail house the age-old truism
> still obtains: "Walls have ears." Thus, we
> hold the minor had no right to exclusion of
> the evidence under the Fourth Amendment.
> (See also People v. Lucero (1987) 190 Cal.
> App.3d 1065, 1067-1069, 235 Cal. Rptr. 751.)

Id. at 751-52.

Generally, the federal courts continue to find a suspect has no reasonable expectation of privacy in areas controlled by the police. As the Court of Appeals for the Eighth Circuit explained when finding the surreptitious recording of a defendant's conversation in a police vehicle did not violate a reasonable expectation of privacy:

> A marked police car is owned and operated by
> the state for the express purpose of
> ferreting out crime. It is essentially the
> trooper's office, and is frequently used as
> a temporary jail for housing and
> transporting arrestees and suspects. The
> general public has no reason to frequent the
> back seat of a patrol car, or to believe
> that it is a sanctuary for private
> discussions. A police car is not the kind
> of public place, like a phone booth, where a
> person should be able to reasonably expect
> that his conversation will not be monitored.

United States v. Clark, 22 F.3d 799, 801-02 (8th Cir. 1994).

The whispered conversation between appellant, his mother, and her boyfriend occurred in the police station's interview room, a room designed for the disclosure, not the hiding, of information. The room had a one-way glass mirror. Detective Gandy did not suggest appellant could speak freely to his mother and her boyfriend without fear of eavesdropping. The police

were in the middle of an investigation into an armed robbery, and appellant knew he was an object of that inquiry. He had no reason to believe this interrogation room was a "sanctuary for private discussions."

Some courts have found a reasonable expectation of privacy, independent of a privilege, if, while in police custody, the officers "lull" a suspect into believing the conversation will be private. See People v. A.W., 982 P.2d 842, 848-49 (Colo. 1999) (detective's assurances that "nobody was behind the two-way mirror" and "he would not be listening" gave rise to a reasonable expectation of privacy regarding A.W.'s conversation with his father in an interrogation room); People v. Plyler, 22 Cal. Rptr. 2d 772, 775 (1993) (trial court appropriately found deputy did not lull Plyler into believing his phone calls would not be recorded).

In People v. Hammons, 5 Cal. Rptr. 2d 317, 320 (1991), after questioning by the police the defendant requested an opportunity to talk to the codefendant who was also at the police station answering questions. Both men were taken in an interview room. Id. at 319. The officer told the codefendants, "we're leaving" and they could "talk by [them]selves." Id. The officer acknowledged in his testimony that he "led them to believe that this was in fact a private conversation between just the [two codefendants]." Id. He then secretly recorded their incriminating conversation.

Here, Detective Gandy made no statements to appellant regarding his ability to converse with his mother and her boyfriend.  Appellant did not ask to speak privately with his mother.[3]  When the boyfriend indicated to Detective Gandy that appellant wanted to talk to a lawyer, the detective simply left the room.  Detective Gandy did not tell them to feel free to discuss the incident privately.  He simply left them alone in the room.

Simply leaving a suspect alone with another individual while in police custody does not create a reasonable expectation of privacy that society is prepared to recognize.  Hearst, 563 F.2d at 1345 (Lanza remains good law); State v. Strohl, 587 N.W.2d 675, 682 (Nebr. 1999) ("The greater weight of authority [follows] Lanza and [allows covert monitoring of conversations] in police stations, jail visiting rooms, or jail cells."); State v. Howard, 728 A.2d 1178, 1182-83 (Del. Super. Ct. 1998) (courts generally find no reasonable expectation of privacy "for overheard or monitored conversations in police cars, police interview rooms, or in prisons"); State v. Smith, 641 So.2d 849, 851-52 (Fla. 1994) (a person has no reasonable expectation of privacy in a conversation in a police car); Plyler, 22 Cal. Rptr. 2d at 775 (ordinarily, a detained person has no reasonable

---

[3] In addition, the record provides no information addressing the reasonability of defendant's assumption that his mother and her boyfriend would not repeat the substance of this conversation.

expectation that the police will not monitor and record incriminating statements).

Because the only "lulling" done by the detective was leaving appellant with his mother and her boyfriend, we cannot find as a matter of law that appellant's expectation of privacy was reasonable.

For these reasons, we hold that the trial court did not err when it denied the motion to suppress.

Affirmed.

Elder, J., dissenting.

I would hold that a right of family privacy protecting certain communications between parents and children is implicit in Virginia law and protects the conversation at issue in this case.[4]  Even in the absence of such a privacy right, I would hold that appellant's subjective expectation of privacy in the interview room was one that society should be prepared to recognize as reasonable under the facts of this case. Therefore, I respectfully dissent.

As the majority observes, the United States Supreme Court noted in Lanza v. New York, 370 U.S. 139 (1962), that "it may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection . . . ."  Id. at 143-44.

---

[4] The majority holds in footnote 2 that appellant did not preserve for appeal the issue of whether a parent-child privilege exists.  As set out infra in the dissent, I would recognize a right of privacy rather than a true privilege. Thus, I would hold that the existence of a parent-child relationship which gives rise to a right of privacy is merely a factor for consideration in determining whether appellant had a reasonable expectation of privacy.  Because appellant properly preserved for appeal the reasonable expectation of privacy issue, I would hold we also may consider the impact of the parent-child relationship on that expectation.  This is precisely the approach appellant advanced in oral argument before this Court.  As the majority acknowledges in footnote 1, "[a]s long as [an] issue [is] properly preserved, an appellate court shall decide the issue according to controlling legal principles."

Although the Supreme Court's discussion of prisoners' privacy and confidential relationships in Lanza was dicta, see id. (noting that Lanza did not claim violation of any special relationship), other courts have relied upon the language in Lanza to recognize exceptions to the generally accepted principle that no Fourth Amendment reasonable expectation of privacy exists in prisoners' conversations with their visitors, see, e.g., North v. Super. Ct., 502 P.2d 1305, 1309-12 (Cal. 1972) (en banc).

In North, for example, the Supreme Court of California held that North had a reasonable expectation of privacy in a conversation with his wife under the circumstances of that case. Id. at 1311-12. The evidence established that the conversation occurred during ordinary visiting hours in a detective's office and that it was "a frequent and normal practice to permit such visits to take place in a detective's office." Id. at 1307. During the five-minute visit, police secretly monitored and recorded North's conversation with his wife. Id.

In holding the contents of the conversation should have been suppressed, the court emphasized that the conduct of a police detective in "surrendering to petitioner and his wife [the detective's] own private office so that they might converse and then by exiting and shutting the door, leaving them entirely alone," "spoke as clearly as words" and had the effect of "lull[ing]" North and his wife "into believing that their

conversation would be confidential." Id. at 1311. Those circumstances, "coupled with the statutory presumption that a conversation between spouses is . . . made in confidence constituted a sufficient showing by [North] to establish a reasonable expectation of privacy."[5] Id. (citation omitted). But see Ahmad A. v. Super. Ct., 215 Cal. App. 3d 528, 535-36 & n.5 (Cal. Ct. App. 1989) (refusing to apply North to jailhouse conversation between minor and parent because California law does not recognize a parent-child privilege of confidentiality).

In People v. Hammons, 235 Cal. App. 3d 1710 (Cal. Ct. App. 1991), a case involving codefendants, the California Court of Appeal expanded the holding in North to conclude that "one [may] . . . reasonably expect privacy in a police station [even] absent a privileged relationship" when that "expectation of privacy [is] based upon express representations by police officers." Id. at 1716-17. Under the facts of that case, defendant Darby invoked his right to remain silent, but codefendant Hammons asked to speak to Darby before talking to police. Id. at 1714. Officer Bourke put the codefendants in an interview room together and left them alone. Id. Although Bourke could not precisely recall everything he said to the

---

[5] Since the decision in North, California's legislature has expanded the list of rights retained by prisoners and specifically "guarantees that prisoners shall retain all rights except to the extent that restrictions are necessary for public safety or institutional security." DeLancie v. Sup. Ct., 647 P.2d 142, 147 n.8 (Cal. 1982).

codefendants, he said, "[W]e're leaving," and admitted that he "led [the codefendants] to believe that this was in fact a private conversation between just the [two codefendants]." Id. The officers then "surreptitiously monitored and tape recorded" the conversation, in which the codefendants incriminated themselves. Id.

The Court of Appeal held that Bourke's statement, although its precise content was uncertain, constituted "an express representation that [the] conversation [would] be private" and that it "create[d] a legitimate and reasonable expectation of privacy" which rendered "the surreptitious monitoring and recording of that conversation . . . violative of the Fourth Amendment." Id. at 1717. Compare Kirkpatrick v. Joseph A. (In re Joseph A.), 30 Cal. App. 3d 880, 885-86 (Cal. Ct. App. 1973) (holding that North did not apply because no privileged relationship existed between juvenile and his uncle but that even if lack of privilege did not defeat claim, officer's actions in granting uncle's request to see juvenile "by himself" in an interrogation room did not amount to implied representation of privacy because request was subject to multiple meanings and trial court construed it to mean "away from other persons in custody" rather than "in private").

Although the issue has not previously been addressed by an appellate court in this state, I would hold that Virginia's statutory scheme compels the protection of a child's

confidential communications with his parent, guardian, legal custodian or other person standing in loco parentis. The statutes governing juvenile and domestic relations district courts require that any proceedings against a juvenile originate in juvenile court, Code § 16.1-241, and that any petition filed in such a court must be served on "at least one parent, guardian, legal custodian or other person standing in loco parentis," Code § 16.1-263(A); see Code § 16.1-269.1 (requiring notice of transfer hearing to member of this group or to juvenile's attorney). Similarly, the United States Supreme Court recognizes that "[d]ue process . . . does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet." In re Gault, 387 U.S. 1, 33-34 (1967). Numerous other legal principles acknowledge the importance of the role of a parent as a confidante and counselor to his minor child. See, e.g., Grogg v. Commonwealth, 6 Va. App. 598, 613, 371 S.E.2d 549, 557 (1988) ("[I]t is desirable to have a parent . . . or some other interested adult or guardian present when the police interrogate a juvenile, and it is even more desirable to have an interested adult present when a juvenile waives fundamental constitutional rights and confesses to a serious crime."); Williams v. Williams, 24 Va. App. 778, 783, 485 S.E.2d 651, 653 (1997), aff'd as modified, 256 Va. 19, 501 S.E.2d 417

(1998) (recognizing right of parents to raise their children as both a fundamental liberty interest and a component of privacy rights); cf. Code § 16.1-283 (permitting termination of parental rights only under extreme circumstances and after efforts by the Commonwealth to provide services necessary to permit continued custody).

A New York court has concluded that protection for certain communications between parents and children, although not technically a statutory or common-law privilege like the generally accepted privileges for attorney-client and interspousal communications, arises from a constitutional "right of family privacy" established by "a host of [United States Supreme Court] cases."  People v. Doe (In re A and M), 403 N.Y.S.2d 375, 378 (N.Y. App. Div. 1978), quoted with approval in People v. Harrell, 450 N.Y.S.2d 501, 504 (N.Y. App. Div. 1982), aff'd on other grounds, 449 N.E.2d 1263 (N.Y. 1983).

> It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice.  Shall it be said to those parents, "Listen to your son at the risk of being compelled to testify about his confidences?"[6]

---

[6] As another commentator has questioned, "[W]hen a child comes to Mom or Dad for advice, do parents need to issue the

    \*      \*      \*      \*      \*      \*

> [T]here can be no doubt what the effect on that relationship would be if the state could compel parents to disclose information given to them in the context of that confidential setting.  Surely the thought of the State forcing a mother and father to reveal their child's alleged misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness and propriety.  It is inconsistent with the way of life we cherish and guard so carefully and raises the specter of a regime which encourages betrayal of one's offspring.  And if, as seems likely, the parents refuse to divulge the child's confidences, the alternatives faced by the parents, i.e., risk of prosecution for contempt or commission of perjury, could seriously undermine public trust in our system of justice.

> The course of constitutional law is filled with instances wherein the interests of the State in achieving a legitimate goal have been balanced against the rights of individual privacy guaranteed by the Constitution. . . .  [Thus], if it is determined that the information sought here was divulged by the boy in the context of the familial setting for the purpose of obtaining support, advice or guidance, we believe that the interest of society in protecting and nurturing the parent-child relationship is of such overwhelming significance that the State's interest in fact-finding must give way.

A and M, 403 N.Y.S.2d at 378-80 (footnote added).

---

classic warning, 'Anything you say may be used against you in a court of law'?  Such an intrusion seems contrary to the political focus on family values."  Margaret Graham Tebo, Parent Privilege:  Lawmakers Seek to Protect Parent-Child Conversation, 86 A.B.A. J. 18 (2000).

In light of the approach of Virginia law to the relationship between juveniles and their parents and the constitutional principles outlined so cogently in A and M, I would hold that the right of family privacy protected appellant's communications with his mother and her partner in much the same way a formal privilege would have.[7]  Under the reasoning of the California Supreme Court in North, Detective Gandy's conduct in "surrendering" the interview room to appellant, his mother and her partner, Carl Gray, after Gray's indication that appellant would make no statement without a lawyer, "so that they might converse and then by exiting and shutting the door, leaving them entirely alone," "spoke as

---

[7] Formal privileges may be "waived" or "broken" if the communication occurs in the presence of a third party to whom the privilege does not apply.  See, e.g., Harris v. Commonwealth, 19 Va. App. 518, 521-22, 453 S.E.2d 292, 294-95 (1995).  As such, if a formal privilege existed here, it could be argued that the presence of Gray, who was merely appellant's mother's partner rather than appellant's father or stepfather, would defeat any assertion of a privilege.  However, in the context of the right to privacy and the principles which support that right, I would conclude that Gray was present as a de facto parent in whom appellant confided just as he likely would have if Gray had been his biological father or stepfather.  Gray described himself to Detective Gandy as appellant's stepfather, and Gandy's testimony about appellant's statements indicated that appellant's mother and Gray treated both appellant and Williams as "their . . . son[s]."  Cf. Code § 16.1-241 (granting juvenile and domestic relations district court jurisdiction over "[a]ll offenses in which one family or household member is charged with an offense in which another family or household member is the victim"); Code § 16.1-228 (defining "[f]amily or household member" to include, inter alia, "any individual who cohabits . . . with the person, and any children of either of them then residing in the same home with the person").

clearly as words" and had the effect of "lull[ing]" appellant "into believing that their conversation would be confidential." North, 502 P.2d at 1311. Those circumstances, "coupled with [the right of family privacy akin to] the statutory presumption that a conversation between spouses is . . . made in confidence constituted a sufficient showing by [appellant] to establish a reasonable expectation of privacy." Id. (citation omitted). Thus, admission of Detective Gandy's testimony regarding appellant's whispered statements violated both the Fourth Amendment and Code § 19.2-65.

Even if no right of family privacy existed under the facts of this case to protect appellant's communications with his mother and her partner, I would hold that Detective Gandy's statements and actions, standing alone, constituted a representation sufficient to afford appellant an objectively reasonable expectation of privacy. See Hammons, 235 Cal. App. 3d at 1716-17; see also People v. A.W., 982 P.2d 842, 848-49 (Colo. 1999) (en banc) (holding officer's explicit assurances that no one was behind the two-way mirror and that he would not be listening in gave rise to objectively reasonable expectation of privacy for juvenile in interview room communications with his father). When Carl Gray told Detective Gandy in appellant's presence that appellant would not make a statement until after they consulted a lawyer, appellant did not contradict Gray, and Gandy acquiesced to the request by leaving

the room.  Gandy testified that he thought "it would be best if [appellant] consulted a lawyer before anything was said." Nevertheless, Gandy "wanted to see if they said anything," so he went to the monitoring room in an effort to overhear any conversation appellant, appellant's mother and Gray might have. Under these circumstances, I would hold that appellant's subjective expectation of privacy in the interview room he occupied with only his mother and her boyfriend was one society was prepared to recognize as reasonable even if Detective Gandy was not so prepared.  Thus, under this approach, as well, admission of Detective Gandy's testimony regarding appellant's whispered statements violated both the Fourth Amendment and Code § 19.2-65.[8]

For these reasons, I would hold that the trial court erroneously denied the motion to suppress, and I would reverse and remand for additional proceedings.  Therefore, I respectfully dissent.

_____

[8] In the absence of a family privilege, appellant's mother and Gray could be called to testify and could be held in contempt for refusing to appear.  However, if both took the stand and testified that appellant spoke to them about the weather rather than the offense for which appellant had been arrested, the Fourth Amendment and Code § 19.2-65 would bar admission of the exchange recorded and overheard by Detective Gandy.