[Cite as *State v. Williams*, 2013-Ohio-5076.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-T-0053** |
| JACQUAVIS KENTRELL WILLIAMS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas.
Case No. 2011 CR 00555.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor, and *LuWayne Annos*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Jacquavis Kentrell Williams, appeals the judgment of conviction entered by the Trumbull County Court of Common Pleas for felonious assault and aggravated robbery. The issues to be determined by this court are whether a motion to suppress statements was properly denied; whether convictions for the foregoing charges are supported by the manifest weight of the evidence; and whether felonious

assault and aggravated robbery are allied offenses that should merge for sentencing. For the following reasons, we affirm the judgment of the lower court.

{¶2} On October 18, 2011, the Trumbull County Grand Jury indicted Williams on one count of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2) and (D)(1)(a), with a firearm specification pursuant to R.C. 2941.145; and one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1) and (C), with a firearm specification pursuant to R.C. 2941.145.

{¶3} On December 2, 2011, Williams filed a motion to suppress statements, asserting that statements he made at the Warren Police Department, including private conversations, were improperly recorded by a hidden surveillance device. A suppression hearing was held on February 17, 2012, where the following facts were adduced through testimony.

{¶4} Detective Wayne Mackey, of the Warren Police Department, indicated he was the lead investigator assigned to a shooting and robbery that occurred on April 12, 2011, at the North End Market in Warren, Ohio. During the investigation, a DNA sample was taken from a drink bottle the victim said had been brought to the counter by the shooter during the robbery. The initial investigation, however, yielded no suspects.

{¶5} Four months after the robbery, the Warren police received a report from the Ohio Bureau of Criminal Identification and Investigation ("BCI") on August 15, 2011, regarding a "hit," i.e. a match, with DNA from the Combined DNA Index System ("CODIS"), a database that includes DNA records of convicted felons. The BCI report indicated that DNA from a major and a minor contributor had been recovered from the drink bottle found at the scene. The victim was identified as the major contributor. The

minor contributor was most probably Williams, whom the report concluded could not be excluded as the source of the sample by a ratio of one in 5,807 unrelated persons.

{¶6} On August 17, 2011, a warrant was issued for Williams' arrest. Later that evening, Williams turned himself in at the Warren Police Department. Detective Mackey testified that at this point, Williams was in custody and was not free to leave.

{¶7} Detective Mackey met with Williams and his mother in a secure waiting area at the station to conduct an interview. Williams did not request a lawyer but wanted his mother present during the interview. Detective Mackey then escorted Williams and his mother to an interview room in a secure and non-public area of the police station.

{¶8} The interview room contained a desk and a couple of chairs. There were no windows or mirrors. Essentially, there was nothing in the room that would lead any person to believe there was any way to view into the room, or anything that would have been recognized as a recording or monitoring device. There was no sign indicating that recording might be taking place. Detective Mackey testified there was a video and audio recording device hidden in the thermostat and that the rooms are monitored for safety purposes. He further testified that Williams was familiar with the interview room, as he had previously been interviewed therein by other detectives regarding another matter. No evidence in the record indicates that Williams' familiarity with the room included knowledge of the hidden recording device.

{¶9} Detective Mackey left Williams and his mother alone in the room with the door closed while he went to retrieve a *Miranda* waiver form and case file. Detective Mackey turned on the recording device just after leaving the room, which recorded a conversation between Williams and his mother. Detective Mackey testified that

3

Williams and his mother did not indicate they wanted to talk alone, request privacy, or ask not to be recorded.

{¶10} While alone with his mother, Williams admitted to being at the North End Market on the day of the incident. He assured her he was innocent and claimed he had frequented the store even after the shooting. Williams insisted he was being "railroaded."

{¶11} The recording then shows Detective Mackey, after he re-entered the room, reading Williams his constitutional rights. Detective Mackey testified that Williams indicated he understood the rights and initialed each line on the form. Williams did not request an attorney and agreed to give the detective a statement. Williams stated he did not know or remember if he had been in the store on the exact date the victim was shot and robbed. Williams told Detective Mackey that he was a regular customer at the store, where he usually purchased the same chips, drink, and a Black and Mild cigar. Williams denied shooting the victim.

{¶12} Following the suppression hearing, both sides submitted briefs in support of their positions. On March 12, 2012, the trial court issued a judgment entry denying Williams' motion to suppress. The court held there was no reasonable expectation of privacy regarding the conversations held in the interview room.

{¶13} A jury trial commenced on March 12, 2012. The following testimony and evidence were presented.

{¶14} Mohammad Darwish testified that he and his wife, Itaf Darwish, own the North End Market, a neighborhood store, and know most of their customers. Darwish testified that a six-foot tall, 180-pound African-American man with a tattoo on his neck, whom he did not know, walked through the front door of his store on April 12, 2011, at

4

approximately 11:30 a.m. The man passed by Nicholas Phelps, a long-time customer, as Phelps was exiting the store.

{¶15} According to Darwish, the man brought a bag of chips and a bottle of blue Guzzler drink to the counter and asked for a Black and Mild cigar. Darwish turned around to get the cigar and placed it on the counter. Without warning, the man shot Darwish and then ordered Darwish to give him money. Darwish gave him cash from the lottery ticket register. The man demanded more. Darwish tried to access a second cash drawer but, due to his injuries, was unable to do so. Instead, Darwish retrieved more cash from the store office.

{¶16} The assailant then headed out of the store and into the parking lot. Darwish saw his wife drive up, went to the door, and warned her to leave. In the meantime, the assailant left heading toward Arlington Street.

{¶17} Itaf testified that when she arrived at the store, her husband was screaming at her to leave, and she saw a man running away from the store. She followed the perpetrator in her car but lost him.

{¶18} Darwish was hospitalized for approximately one week. The bullet shattered his hand and tore through his stomach. He initially told Detective Mackey that he could identify the shooter if given the opportunity to see him again, but the police came up with few leads and had no suspect for several months.

{¶19} Lindsey Nelsen-Rausch, a forensic scientist at BCI, testified that, during the course of the investigation, she took a touch DNA sample from the drink bottle submitted to BCI by the Warren Police Department. Pursuant to Detective Mackey's testimony, this DNA was ultimately matched with DNA in the CODIS system, which belonged to Williams.

5

{¶20} Brenda Gerardi of BCI testified that the DNA profile found on the bottle was a "mixture," including both "major" and "minor" contributors. The major contributor to the DNA sample was Darwish. The minor DNA contributor matched Williams, insomuch as Williams could not be excluded as a source of the sample by a ratio of one in 5,807 unrelated individuals. Based on the DNA evidence, a warrant was issued for Williams' arrest.

{¶21} Dawn Limpert of BCI testified that she compared partial fingerprints found on the drink bottle with fingerprints from Williams and found that he was not the source of the prints. She did not match any individuals to the fingerprints on the drink bottle.

{¶22} Approximately four months after the incident, Detective Mackey presented Darwish and Phelps with photo arrays that included a picture of Williams. Both men were unable to identify Williams.

{¶23} The video recording of the interview made after Williams surrendered to the police was played at the suppression hearing and for the jury. This included his statement to his mother that he was at the store on the date of the incident but was innocent. When Detective Mackey returned, however, Williams stated he could not remember when he had been in the store. As was testified to at the suppression hearing, Williams stated that, on the occasions when he did go to the store, he always purchased chips, a drink, and a Black and Mild cigar.

{¶24} Following the trial, the jury found Williams guilty on both counts, including the firearm specifications.

{¶25} A sentencing hearing was held on May 16, 2012. At the hearing, Williams' counsel argued that aggravated robbery and felonious assault should be merged. The court found there was a separate animus for the shooting and the robbery and, thus,

were two separate crimes for the purpose of sentencing. The trial court concluded that the victim did not need to be shot to carry out the robbery, and there was "a malice separate from theft with a deadly weapon" involved in the shooting incident.

{¶26} The trial court sentenced Williams to a term of seven years in prison for felonious assault, seven years for aggravated robbery, and three years each for the firearm specifications, all to be served consecutively, for a total prison term of 20 years.

{¶27} Williams timely appealed and raises the following assignments of error:

[1.] The trial court erred, as a matter of law, by denying the appellant's motion to suppress statements made by the appellant during a conversation with his mother which occurred in a room at the Warren Police Department.

[2.] The appellant's convictions are against the manifest weight of the evidence.

[3.] The trial court erred, as a matter of law, by sentencing the appellant for both the crimes of aggravated robbery and felonious assault, along with the related gun specifications.

{¶28} In his first assignment of error, Williams argues the trial court erred by failing to suppress the conversation he had alone with his mother in the police station interview room. Williams asserts that he was entitled to an expectation of privacy and that the surreptitious recording of the conversation between Williams and his mother violated Williams' rights under the Fourth Amendment to the United States Constitution.

{¶29} "The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses." (Citation omitted.) *State v. Ferry*, 11th Dist. Lake No. 2007-L-217, 2008-Ohio-2616, ¶11. "[T]he trial court is best able to decide facts and evaluate the credibility of witnesses." (Citation omitted.) *State v. Wagner*, 11th Dist. Portage No. 2010-P-0014, 2011-Ohio-772, ¶12. "The court of appeals is bound to accept factual determinations of the trial court made during the

7

suppression hearing so long as they are supported by competent and credible evidence." *State v. Hines*, 11th Dist. Lake No. 2004-L-066, 2005-Ohio-4208, ¶14. "Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts." (Citations omitted.) *Ferry* at ¶11.

{¶30} Under general Fourth Amendment principles, a communication cannot be intercepted if there is an actual and justifiable expectation of privacy from the government. *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, ¶13. The Fourth Amendment protects an individual's subjective expectation of privacy when the expectation is reasonable. *Id.* at ¶14, citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A fact-intensive, totality-of-the-circumstances inquiry is required in order to determine whether a specific place qualifies as "a place where there is a reasonable expectation of privacy." *Savoy v. United States*, 604 F.3d 929, 937 (6th Cir.2010).

{¶31} An intensive inquiry into the facts is necessary to determine whether a reasonable expectation of privacy exists in a certain place under certain circumstances. Given a certain set of facts, a legitimate expectation of privacy may exist though a person is under arrest and in an interrogation room. We do not believe that one can never have a reasonable expectation of privacy in a police interrogation room.

{¶32} The majority of cases conclude there is no reasonable expectation of privacy in conversations that occur in police stations, including interrogation rooms. *See, e.g.*, *State v. Strohl*, 587 N.W.2d 675, 682 (Neb.1999) ("[t]he greater weight of authority * * * has consistently * * * upheld the admission of monitored conversations in police stations"); *Belmer v. Commonwealth*, 553 S.E.2d 123, 128 (Va.App.2001) ("[g]enerally, the federal courts continue to find a suspect has no reasonable

8

expectation of privacy in areas controlled by the police"). However, these cases continue to make a fact-intensive inquiry into whether a reasonable expectation of privacy existed. There are important factual distinctions between these cases and the case at issue.

{¶33} Other courts have found a reasonable expectation of privacy in a police interrogation room under facts similar to those presented here. *See, e.g., State v. Calhoun*, 479 So.2d 241, 244-245 (Fla.App.1985) (where there was a hidden camera and a *Mirandized* defendant was left alone to converse with his brother in an interrogation room pursuant to the defendant's request to speak privately with his brother, the conversation was not admissible); *State v. Howard*, 728 A.2d 1178, 1184 (Del.1998) (because there was no evidence that the defendant was told of the possibility of monitoring or that the defendant could see the camera, the defendant's expectation of privacy was reasonable).

{¶34} The state of Ohio argues that no reasonable expectation of privacy existed when appellant was left alone with his mother in the interview room; it relies mainly on two cases, both of which are distinguishable. First, the Seventh District has held that a defendant in custody did not have a reasonable expectation of privacy in a police interrogation room containing a two-way mirror. *State v. Clemons*, 7th Dist. Belmont No. 10 BE 7, 2011-Ohio-1177, ¶74-76. The *Clemons* court placed great weight on the presence of the two-way mirror in distinguishing it from other cases where it was determined that a reasonable expectation of privacy did exist. Furthermore, the *Clemons* court noted that the defendant had whispered the incriminating statements, indicating he was aware someone might be listening. *Id.* at 70. In this case, there was

9

no two-way mirror or anything else to indicate the possibility of monitoring. Further, neither appellant nor his mother whispered during the conversation.

{¶35} Second, in *Belmer v. Commonwealth*, 553 S.E.2d 123 (Va.App.2001), the Virginia Court of Appeals addressed the surreptitious monitoring of a conversation between the defendant and his mother that occurred in the police station's interview room. The *Belmer* court emphasized that (1) the detective never stated the defendant could speak freely; (2) the defendant knew he was the subject of an armed robbery investigation; and (3) the defendant "had no reason to believe this interrogation room was a 'sanctuary for private discussions.'" *Id.* at 129. The *Belmer* court held that, under the circumstances, no reasonable expectation of privacy existed: the room contained a two-way mirror, the conversation was whispered, and signs were posted that indicated the interview rooms were being monitored. *Id.* at 125. The defendant did not see the signs, but his mother and her boyfriend walked past them. *Id.* In the present case, there was no two-way mirror, no signs posted, and no whispering by appellant or his mother. Thus, in *Belmer*, there are facts to support the holding that the defendant had no reasonable expectation of privacy—facts that are not present here.

{¶36} The state of Ohio further takes the position that this case is similar to those related to the recording of conversations in police cars, where it is well-established that a detainee has no reasonable expectation of privacy under the Fourth Amendment. *See State v. Ingram*, 9th Dist. Medina No. 10CA0022-M, 2010-Ohio-3546, ¶17; *State v. Blackwell*, 8th Dist. Cuyahoga No. 87278, 2006-Ohio-4890, ¶33-35; *State v. Skidmore*, 12th Dist. Warren No. CA99-12-137, 2000 Ohio App. LEXIS 3535, *16 (Aug. 7, 2000).

{¶37} The Seventh District has commented on the similarity between a police interview room and the back of a police car, stating, "there is really nothing to distinguish a police interrogation room from conversations in the back of a police car." *Clemons*, *supra*, at ¶75. We disagree. Police cars are typically equipped with visible cameras or other recording devices. Therefore, an expectation of privacy in the back of a police car is not reasonable as a matter of course.

{¶38} The problem in this case is that the interrogation room contained no indicia that the activity *could* be monitored or recorded. Except for the table and chairs, it was an empty room, with no windows or other means of viewing into the room. The only other discernible object in the room was a thermostat. It is not reasonable to suggest that most people would expect a thermostat to be a video and audio recording and monitoring device. If the police truly believe that no reasonable person would have an expectation of privacy in such a room, the recording equipment should not need to be disguised.

{¶39} The reasons given for hiding a recording device in a thermostat are unconvincing. It is disingenuous to assert that the reason for the recording device is to protect against escape, suicide attempts, or the passing of contraband between persons. These goals are readily accomplished with visible equipment. Indeed, if the purpose is to discourage nefarious conduct within interview rooms, a visible camera would be more valuable because its presence would deter such conduct. Hidden recording devices are quite obviously intended to secretively gather evidence for use in criminal prosecutions.

{¶40} The interview room used in this case is actually designed and arranged to suggest activity in the room is not being recorded. As a result, a reasonable person,

regardless of his status, would have an expectation that he is *not* being monitored. Thus, the statements should have been suppressed.

{¶41} However, that does not end the inquiry. If Williams was not prejudiced by the admission of the statement, the error is harmless. Constitutional errors in the admission of evidence are non-prejudicial when harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). Constitutional error in the admission of evidence is harmless beyond a reasonable doubt when "the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the syllabus. Admission of a statement in violation of the defendant's constitutional rights is harmless beyond a reasonable doubt when it is duplicative of other admissible testimony. *See State v. Jenkins*, 11th Dist. Lake No. 2003-L-173, 2005-Ohio-3092, ¶38.

{¶42} Even if the trial court suppressed the statements Williams argues should have been excluded, the remaining evidence provided overwhelming proof of Williams' guilt. The conversation was limited to Williams' statements that he had been in the store on the date of the shooting but did not shoot Darwish, and his description of items that he usually purchases when he is in the store. Williams later told Detective Mackey that he did not shoot Darwish but indicated he was not sure whether he had been in the store on the day Darwish was shot. The item description was also later provided to Detective Mackey during the course of the formal interview and, therefore, was already properly before the jury. Furthermore, Williams argues in his brief that "it was uncontroverted that the Appellant was in the store on the morning of the incident" to support the argument that his DNA could have been on the bottle without warranting a finding that he was the perpetrator of the crime. Therefore, Williams' statement to his

mother that he had been in the store that day was actually beneficial in light of the DNA evidence adduced at trial, as it established a justification for his DNA being present on the bottle found at the scene.

{¶43} Thus, although Williams' statements should have been suppressed, their admission was harmless beyond a reasonable doubt. Therefore, his first assignment of error is without merit.

{¶44} In his second assignment of error, Williams argues his convictions were against the manifest weight of the evidence because the DNA evidence was weak and the witnesses were unable to identify him in the photo array.

{¶45} Generally, the weight to be given to the evidence and the credibility of the witnesses is for the trier of fact to determine. *State v. Thomas*, 70 Ohio St.2d 79, (1982), syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The reviewing court must consider all the evidence in the record, reasonable inferences, and the credibility of the witnesses to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Id.*

{¶46} The jury did not clearly lose its way in finding Williams guilty of aggravated robbery and felonious assault. It was uncontested that Darwish was shot and robbed. The only contested issue was the identity of the perpetrator. The evidence showed that Darwish was able to provide a description of the shooter that was similar to Williams.

13

Darwish explained that the man was a similar height and weight and had a tattoo on his neck. Although Darwish and the other witness, Phelps, were not able to pick Williams out of the photo array, the testimony of his general description could still be considered by the jury and weighed in favor of the state's case. The witnesses' estimation of the perpetrator's height and weight vary slightly. There was some question about certain minor changes in the witnesses' description of the perpetrator regarding whether he had light or dark skin. We emphasize, however, that credibility of witnesses is an issue to be determined by the finder of fact. *Thompkins* at 387. The witnesses described an African-American male, between 5'9 and 6'0, 180-200 pounds, with a tattoo on his neck. That description, including the tattoo, is consistent with Williams' appearance, and the jury could properly consider it along with the other evidence against him.

{¶47} Williams also admitted to Detective Mackey that, when he had been in the store in the past, he usually purchased the same items: chips, drink, and Black and Mild cigars. These were the same items brought to the counter or requested by the perpetrator. Touch DNA from a minor contributor recovered from the Guzzler drink bottle brought to the counter matched Williams' DNA. He could not be excluded as a source of the sample by a ratio of one in 5,807 unrelated individuals. While this evidence does not eliminate all other individuals as possible DNA matches, the DNA match is not meaningless. There is no requirement that evidence of DNA be a perfect match to be submitted at trial.

{¶48} We cannot say the jury lost its way. The state is not required to prove its case beyond *all* doubt. The DNA evidence, the description, and the information about the items Williams usually purchased provided a basis upon which the jury could find beyond a *reasonable* doubt that Williams was guilty of shooting and robbing Darwish.

14

{¶49} Williams' convictions were not against the manifest weight of the evidence. Thus, his second assignment of error is without merit.

{¶50} In his third assignment of error, Williams argues that the trial court erred in sentencing him for both aggravated robbery and felonious assault, along with the related gun specifications, as they were committed with the same animus and should have merged.

{¶51} The Ohio Supreme Court has clarified that in reviewing a trial court's R.C. 2941.25 merger determination, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶28. However, we note that the trial court conducted an extended analysis based on the facts adduced at trial.

{¶52} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution" prohibiting multiple punishments for the same offense. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶23. It provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). However, "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each," separate convictions and punishments are proper. R.C. 2941.25(B).

{¶53} To determine whether two offenses are allied offenses of similar import subject to merger, we consider the conduct of the accused. *State v. Johnson*, 128 Ohio

15

St.3d 153, 2010-Ohio-6314, syllabus. The Ohio Supreme Court has described the application of R.C. 2941.25 to specific conduct as follows:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.
>
> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting).
>
> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.
>
> Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

*Johnson* at ¶48-51.

{¶54} Because it is possible to commit felonious assault and aggravated robbery by the same conduct, the issue here turns on whether the two crimes were committed with the same act and a single state of mind. If they were, merger would be appropriate. However, the trial court did not err when it failed to merge the two offenses and correctly sentenced appellant separately for felonious assault and aggravated robbery. R.C. 2941.25(B).

{¶55} The testimony of Darwish established that Williams asked for a cigar, Darwish turned to retrieve the cigar, and upon turning back around, was immediately shot by Williams. Following the shot, Williams then asked Darwish to give him the

16

money. Darwish handed him money from the register, and Williams demanded more money, which Darwish gave him. The shooting occurred *before* the request for money, and there was no evidence that Darwish failed to comply with any orders made by Williams.

{¶56} The testimony showed that the shooting was not necessary to carry out the robbery. There is no evidence to support a conclusion that Williams needed to fire the shot to gain compliance. Instead, he could have used the weapon as a threat to complete the robbery.

{¶57} As the trial court noted:

> [T]here was not a single act with a single state of mind demonstrated by the actions of the defendant. The Defendant shot the storekeeper before he demanded the money while he was threatening the storekeeper with a firearm. The storekeeper gave the defendant no reason to shoot him and was cooperating at all times. The aggravated robbery could have been easily accomplished by means of the threat with a deadly weapon. Not only was the shooting of the storekeeper unnecessary to accomplish the robbery, it demonstrated malice separate from the theft with a deadly weapon, to harm with a deadly weapon. The bottom line is that there were two (2) acts committed with two different states of mind * * *.

{¶58} Shooting the victim resulted in serious and significant harm. Threatening the victim would not have had nearly the same impact. Accepting the position posed by appellant would result in *no* separate consequence for *shooting* the victim, as opposed to just threatening and robbing him.

{¶59} Several districts have held that using greater force than necessary to complete an aggravated robbery also indicates a separate animus. *See State v. Shields*, 1st Dist. Hamilton No. C-100362, 2011-Ohio-1912, ¶19 (by physically attacking the victim, the defendant "subjected the [victim] to a substantially graver harm than if he

17

had merely displayed, brandished, indicated his possession of, or threatened to use" the weapon in the robbery, which constituted a separate crime); *State v. Ruby*, 6th Dist. Sandusky No. S-10-028, 2011-Ohio-4864, ¶61 (a separate animus existed as to the assault, since it was unnecessary to commit the theft offense and to establish physical control over the victims); *State v. Diggle*, 3rd Dist. Auglaize No. 2-11-19, 2012-Ohio-1583, ¶18 ("a defendant's excessive use of force is an indication of a separate animus"). Similarly, if one offense is complete before the other begins, the offenses are considered separately for sentencing. *See State v. Dewitt*, 2d Dist. Montgomery No. 24437, 2012-Ohio-635, ¶33.

{¶60} The shooting constituted a greater use of force than necessary to accomplish the robbery. As the assault did not further or aid in the commission of the robbery, it was a separate act with a separate animus. *See Shields*, *supra*, at ¶19 ("this assault was so unnecessary for the robbery itself that it demonstrated a significance independent of that robbery"). Furthermore, the felonious assault was completed the moment the gun was fired. As this occurred before any demand for money, the felonious assault was complete before the robbery began.

{¶61} Williams cites *State v. Darnell*, 5th Dist. Delaware No. 10 CAA 10 0083, 2011-Ohio-3647, in support of his claim that the two offenses were committed with the same animus. In *Darnell*, the court held that the defendant caused "harm to the victim with the butcher knife while demanding money" and that the assault and robbery were committed with a single animus. That case is distinguishable, insomuch as the victim could not recall exactly when the assault occurred, and the court noted the assault took place "while [the defendant was] demanding money." In the present matter, it is clear that the shooting occurred prior to the act of robbery.

18

{¶62} The third assignment of error is without merit.

{¶63} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J., concurs in part and concurs in judgment only in part, with a Concurring Opinion;

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

_____

DIANE V. GRENDELL, J., concurs in part and concurs in judgment only in part, with a Concurring Opinion.

{¶64} I concur in the judgment and opinion of this court with respect to the second and third assignments of error.

{¶65} With respect to the first assignment of error, however, I concur in judgment only. Under this assignment, the majority holds that, although Williams was entitled to a reasonable expectation of privacy in the police interview room, the admission of his statements made during a conversation with his mother was harmless error and reversal is not warranted. While I agree that reversal is improper, this conclusion is due to the fact that Williams did not have a reasonable expectation of privacy and the statements he made during the conversation were correctly admitted by the trial court.

{¶66} As noted by the majority, the greater weight of the authority on this issue holds that a defendant does not have a reasonable expectation of privacy in police stations and interrogation rooms. *See, e.g., State v. Strohl*, 587 N.W.2d 675, 682 (Neb.1999); *Belmer v. Virginia*, 553 S.E.2d 123, 128 (Va.App.2001). Many cases reach

19

this conclusion, while considering the nature of police interrogation rooms. For example, in *Mai v. Horel*, N.D.Cal. No. C 05-5272 MMC, 2009 U.S. Dist. Lexis 19322 (Feb. 26, 2009), the court held that, similar to a jail, an individual in a police interrogation room has no reasonable expectation of privacy, since, like a jail, the room "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Id.* at 7. *See Michigan v. Moy*, Mich.App. No. 277548, 2008 Mich. App. LEXIS 2182, 4-5 (Nov. 13, 2008) ("[w]e do not believe that society is prepared to accept as reasonable defendant's subjective belief that he could sit in a police station interview room and utter statements without the possibility of being overheard by the police, at least in the absence of any evidence of police conduct intended to give defendant the impression that the room would be private"); *Belmer* at 128-129 (the police station's interview room is "a room designed for the disclosure, not the hiding, of information").

**{¶67}** As the State emphasizes, this case is similar to those involving the recording of conversations in police cars, where it is well-established that a detainee has no reasonable expectation of privacy under the Fourth Amendment. Although this position is rejected by the majority, it is a valid comparison, since, in both cases, a defendant is in an area controlled by police that is commonly known to utilize equipment to record or monitor an individual's activity and statements. *See Belmer* at 128, citing *United States v. Clark*, 22 F.3d 799, 801-802 (8th Cir.1994) (comparing the recording of conversations in a police car to recording in a police interview room).

**{¶68}** The foregoing case law warrants a conclusion that there can be no expectation of privacy in a police interview or interrogation room. A defendant who is in such a room is aware that he is subject to police monitoring and is generally present to give a statement or be interviewed. That police would make a record of conversations

20

held in such a room, a place where police attempt to discover the details of a crime, should not be surprising or unexpected.

{¶69} Such a conclusion is also warranted under the specific facts of this case. Williams was taken into several different secured areas of the police station which could not be accessed by the general public, including the interview room. This is the type of area that would be subject to greater security and more surveillance, as discussed above. Although there was no visible indication that Williams was being watched, he should have expected that cameras or other recording devices were present. Williams also should have known that he lacked privacy based on the fact that he had turned himself in on an arrest warrant. Detective Mackey testified that Williams was not free to leave the police station, due to the warrant, Williams had turned himself in, he was in custody, and was fully aware of these facts. Williams' statements were subject to scrutiny and he was not justified in expecting otherwise.

{¶70} Further, Williams never questioned whether he was being recorded or requested any privacy whatsoever. Williams was not given a false expectation of privacy or told by police that they would not be listening or that he and his mother were free to talk by themselves. *Compare Colorado v. A.W.*, 982 P.2d 842, 848-849 (Colo.1999) (the defendant had a reasonable expectation of privacy when he received assurances from police that they would not be listening in on his conversation with his father). There was no evidence to justify a finding that Williams had a subjective expectation of privacy. *See Ahmad A. v. Superior Court*, 215 Cal.App.3d 528, 535, 263 Cal.Rptr. 747 (1989) (finding no expectation of privacy when the record was lacking evidence as to the defendant's subjective belief).

21

{¶71} While the majority cites several cases and distinguishes them by noting that a two-way mirror existed in those cases, unlike the present matter, it must be emphasized that many courts have held that there is no expectation of privacy in general in interrogation rooms, due to the fact that they are located in a police station, not based on the room's physical characteristics. The existence of a two-way mirror, or a lack of one, does not change this general principle or negate the fact that there was limited evidence to support a determination that Williams believed his conversation was private. *See State v. Owens*, 2002 SD 42, 643 N.W.2d 735, ¶ 72 (the defendant "had no objective or subjective expectation of privacy in the interrogation room of a police station"); *Belmer*, 553 S.E.2d at 129 (courts generally find no reasonable expectation of privacy "for overheard or monitored conversations in police cars, police interview rooms, or in prisons") (citation omitted). Although the majority holds that the hidden nature of the recording devices created an expectation of privacy, this is not consistent with the foregoing law and the concept that a police station is not a place where individuals have an objective, reasonable expectation of privacy.

{¶72} For the foregoing reasons, I concur in judgment only as to the first assignment of error, since Williams did not have a subjective or objective expectation of privacy in the police interrogation room. I concur in the remaining assignments of error.

_____

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

{¶73} I concur with the lead opinion that appellant's first and second assignments of error should be affirmed. However, I dissent with respect to appellant's third assignment of error.

22

{¶74} Regarding appellant's first assignment, I agree with the lead opinion that one may have a legitimate expectation of privacy in a police interview or interrogation room, and that appellant in this case in fact did. Although the statements at issue between appellant and his mother when they were alone in the room should have been suppressed, the error, however, was harmless because appellant was not prejudiced by its admission.

{¶75} Detective Mackey testified at the suppression hearing that the interrogation rooms at the WPD are "monitored for safety purposes." However, the record establishes that not only are the rooms monitored, they are recorded. It is troubling that police interrogation rooms which are supposed to be "monitored for safety purposes," are in fact recording private conversations through means of hidden cameras, contained inside thermostats and not visible to the naked eye.

{¶76} The record from the suppression hearing further establishes that appellant, who turned himself in pursuant to an arrest warrant, requested that his mother be present during the interview. Thus, Detective Mackey escorted appellant and his mother through a secured area of the WPD and into interview room No. 2. There is a presumption of privacy in that interrogation room because it contains no two-way mirror, no window, and no visible camera. That interrogation room also contains a door, which Detective Mackey closed when he left appellant alone in the room with his mother. No signs were posted in that room, or anywhere else at the station, indicating that a recording was taking place. Neither appellant nor his mother gave their permission to be recorded. Under these facts, appellant had a reasonable and justifiable expectation of privacy which is protected by the Fourth Amendment. *See State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, ¶14.

23

{¶77} However, appellant's limited commentary with his mother did not change once he was *Mirandized* and questioned by Detective Mackey. Appellant admitted to his mother that he was at the North End Market on the day of the incident but claimed he was innocent. After being *Mirandized*, appellant also told Detective Mackey that he was at the North End Market on the day of the incident but claimed he was innocent.

{¶78} Thus, based on the facts presented, I agree with the lead opinion that the failure of the trial court to suppress the statements made between appellant and his mother in the interrogation room constitutes harmless error as appellant suffered no prejudice as a result of its admission.

{¶79} Regarding appellant's second assignment, I concur with the lead opinion's finding that appellant's convictions were not against the manifest weight of the evidence.

{¶80} With regard to the manifest weight of the evidence, the jury is in the best position to assess the credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967).

{¶81} Here, the jury chose to believe the state's witnesses who collectively established the following: the North End Market was the subject of a shooting and robbery on April 12, 2011 at approximately 11:30 a.m.; the store owner, Mr. Darwish, was working at the time of the incident; a six-foot tall, 180 pound African-American man with a tattoo on his neck brought a bag of chips and a bottle of Guzzler to the counter and asked for a Black and Mild cigar; Mr. Darwish turned around to get the cigar and placed it on the counter; without warning, the man shot Mr. Darwish in the left hand and stomach; the shooter ordered Mr. Darwish to give him money; the assailant then ran from the store with cash in hand; detectives secured the crime scene and bagged the

24

chips, Guzzler, and Black and Mild cigar for evidence; the bullet shattered Mr. Darwish's hand, tore through his stomach, and he was hospitalized for a week; detectives later received a CODIS hit from BCI after the outside of the Guzzler bottle was swabbed and touch DNA was successfully recovered; the major contributor to the DNA sample was Mr. Darwish and the minor contributor matched appellant; appellant could not be excluded as a source of the sample by a ratio of one in 5,807 unrelated individuals; appellant, a six-foot tall, 180 pound African-American man with a tattoo on his neck, surrendered to authorities; appellant admitted that he was at the North End Market on the day of the incident and purchased chips, a Guzzler, and a Black and Mild cigar.

{¶82} Thus, appellant matched the physical description of the perpetrator, left his DNA at the crime scene, admitted to being at the crime scene on the day of the incident, and admitted to purchasing the same exact items collected by the assailant seconds before the shooting and robbery. Therefore, based on the evidence presented, the jury did not clearly lose its way in finding appellant guilty of felonious assault and aggravated robbery.

{¶83} Regarding appellant's third assignment, I dissent. With respect to the aggravated robbery and felonious assault charges, the lead opinion contends that merger was not warranted and no error was made by the trial court because a separate animus existed for each of the crimes. Based on the facts presented, I disagree.

{¶84} This writer wishes to expand on the lead opinion's citations regarding allied offenses and the judicial doctrine of merger by providing the following background:

{¶85} Our review of an allied offenses question is de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶12. "R.C. 2941.25 'codifies the protections of

25

the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense.' *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, * * * ¶23. At the heart of R.C. 2941.25 is the judicial doctrine of merger; merger is 'the penal philosophy that a major crime often includes as inherent therein the component elements of other crimes and that these component elements, in legal effect, are merged in the major crime.' *State v. Botta*, 27 Ohio St.2d 196, 201 * * * (1971)." (Parallel citations omitted.) *Williams* at ¶13.

**{¶86}** R.C. 2941.25 states:

**{¶87}** "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶88}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶89}** "R.C. 2941.25(A) clearly provides that there may be only *one conviction* for allied offenses of similar import. Because a defendant may be convicted of only one offense for such conduct, the defendant may be sentenced for only one offense. * * * [A]llied offenses of similar import are to be merged at sentencing. *See State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, * * * ¶43; *State v. McGuire* (1997), 80 Ohio St.3d 390, 399 * * *. Thus, a trial court is prohibited from imposing individual sentences for counts that constitute allied offenses of similar import. * * * Both R.C. 2941.25 and the

26

Double Jeopardy Clause prohibit multiple convictions for the same conduct. For this reason, a trial court is required to merge allied offenses of similar import at sentencing." *Underwood, supra*, at ¶26-27. (Emphasis sic.) (Parallel citations omitted.)

{¶90} "Under Crim.R. 52(B), '(p)lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' * * * [I]mposition of multiple sentences for allied offenses of similar import is plain error. *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087 * * * ¶96-102." *Underwood, supra*, at ¶31. (Parallel citation omitted.)

{¶91} By way of background, the method employed by courts in determining whether two crimes constitute allied offenses of similar import has evolved. In *State v. Rance*, 85 Ohio St.3d 632 (1999), the Supreme Court of Ohio held that "[u]nder an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared *in the abstract.*" *Id.*, paragraph one of the syllabus. (Emphasis sic.) Since its release, *Rance* has gone through various modifications and revisions. *See State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625; *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569; *State v. Winn*, 121 Ohio St.3d 413, 2009-Ohio-1059.

{¶92} The Supreme Court of Ohio revisited the allied offenses analysis again in 2010 and overruled *Rance* in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. Under the new analysis, which this court later relied upon and embraced in *State v. May*, 11th Dist. No. 2010-L-131, 2011-Ohio-5233, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Johnson*, at the syllabus. The *Johnson* court provided the new analysis as follows:

27

{¶93} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶94} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' * * *.

{¶95} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶96} "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has [a] separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Id.* at ¶48-51. (Citations omitted.) (Emphasis sic.)

{¶97} This court went on to state in *May, supra,* at ¶50-51:

{¶98} "'In departing from the former test, the court developed a new, more context-based test for analyzing whether two offenses are allied thereby necessitating a merger. In doing so, the court focused upon the unambiguous language of R.C. 2941.25, requiring the allied-offense analysis to center upon the defendant's conduct, rather than the elements of the crimes which are charged as a result of the defendant's conduct.'" [*State v.*] *Miller*[, 11th Dist. No. 2009-P-0090, 2011-Ohio-1161,] at ¶47, citing *Johnson* at ¶48-52.

**{¶99}** "'The (*Johnson*) court acknowledged the results of the above analysis will vary on a case-by-case basis. Hence, while two crimes in one case may merge, the same crimes in another may not. Given the statutory language, however, this is not a problem. The court observed that inconsistencies in outcome are both necessary and permissible "* * * given that the statute instructs courts to examine a defendant's conduct - an inherently subjective determination.'" *Miller* at ¶52, quoting *Johnson* at ¶52.

**{¶100}** In this case, the issue is whether aggravated robbery and felonious assault are allied offenses of similar import subject to merger for purposes of sentencing, which we review de novo. *Williams, supra,* at ¶12.

**{¶101}** Aggravated robbery, under R.C. 2911.01(A)(1), states in part: "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

**{¶102}** Felonious assault, under R.C. 2903.11(A)(2), provides in part: "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶103}** Applying *Johnson*, aggravated robbery and felonious assault are allied offenses of similar import, as it is possible to commit one offense and commit the other with the same conduct. *See State v. Sanders*, 8th Dist. No. 97383, 2012-Ohio-3566, ¶23. Again, under R.C. 2941.25, Ohio's multiple-count statute, if a defendant's conduct results in allied offenses of similar import, the defendant may ordinarily be convicted of

only one of the offenses. R.C. 2941.25(A). However, if the defendant commits each offense separately or with a separate animus, then convictions may be entered for both offenses. R.C. 2941.25(B).

{¶104} Thus, although aggravated robbery and felonious assault are allied offenses, the specific facts of this case must be reviewed to determine whether appellant committed the charged offenses separately or with a separate animus so as to permit multiple punishments. Although the lead opinion finds that the facts do not support merger, I find the opposite.

{¶105} In this case, the record establishes that appellant evidenced the same animus in committing these offenses. Looking to the conduct of the accused, this was a single act with a single state of mind. The test under *Johnson* is not whether the elements line up, which is the essence of the *Rance* analysis. Rather, the test is whether the crimes were committed by the same conduct and with the same animus. In this case, they were.

{¶106} At the sentencing hearing, appellant's counsel argued that the aggravated robbery and felonious assault charges should merge for purposes of sentencing. Following a lengthy discussion, the trial court determined that the offenses would not merge because each was committed with a separate animus. Based on the facts presented, I agree with defense counsel and disagree with the trial court.

{¶107} Appellant cites to *State v. Darnell*, 5th Dist. No. 10 CAA 10 0083, 2011-Ohio-3647, for the proposition that aggravated robbery and felonious assault should merge. Although the facts in that case are not identical to the facts in our case, they are similar. In *Darnell*, the Fifth District found the offenses were committed with the same

animus because the defendant approached the victim and demanded money while brandishing a butcher knife. *Id.* at ¶84.

{¶108} In this case, the record establishes that appellant evidenced the same animus in committing these offenses. Looking to the conduct of the accused, this was a single act with a single state of mind. Appellant, posing as a customer, shot Mr. Darwish and demanded money from him. Appellant committed the felonious assault to implement the aggravated robbery. Stated differently, the shooting was part of appellant's efforts to obtain the money.

{¶109} The fact that Mr. Darwish was shot just prior to the demand for money is irrelevant, as the two crimes were not committed with a separate animus. There is nothing in the record before us that establishes the shooting was anything other than part and parcel of the robbery. There is no evidence of any occurrence or problem between appellant and Mr. Darwish before the money demand was made. Rather, the record reveals that appellant used the gun and shot Mr. Darwish as part of his efforts to obtain the money.

{¶110} "'[T]he purpose of R.C. 2941.25 is to prevent shotgun convictions, that is, multiple findings of guilt and corresponding punishments heaped on a defendant for closely related offenses arising from the same occurrence.'" *State v. Helms*, 7th Dist. No. 08 MA 199, 2012-Ohio-1147, ¶68, quoting *Johnson, supra,* at ¶43, citing *Maumee v. Geiger*, 45 Ohio St.2d 238, 242 (1976).

{¶111} Based on the facts of this case, this writer believes the offenses of aggravated robbery and felonious assault are allied offenses of similar import, were committed with the same animus, and should have merged. Therefore, I believe the trial court erred in stacking those offenses along with the firearm specifications.

{¶112} For the foregoing reasons, I agree with the lead opinion that appellant's first and second assignments of error should be affirmed. However, unlike the lead opinion, I believe appellant's third assignment of error should be reversed and remanded. Thus, I concur in part and dissent in part.